CITY OF MILWAUKEE, Respondent, vs. THE STATE and
others, Appellants.

*May 6—June 20, 1927.*

*Navigable waters: Title to submerged lands: Power of state to
concede title for private use: Concession to aid navigation:
To improve Milwaukee harbor.*

1. Where the legislature has enacted statutes within the proper
   field of legislation and not violative of the federal and state
   constitutions, its edicts are supreme and cannot be interfered
   with by the courts; and where legal principles have been laid
   down by the courts in the proper exercise of their judicial
   functions and have continued in force for such a period as
   to create vested rights, such principles are clothed with a
   force possessed by statutory enactment, and should be recog-
   nized and applied until the law-making body sees fit either to
   abrogate or modify them.  p. 428.
2. Ch. 285 of the Laws of 1923, ceding to the city of Milwaukee
   certain submerged lands in Lake Michigan and authorizing
   the filling in and the reclaiming of certain portions thereof
   and the conveyance to the owners of the shore land adjacent
   thereto, in order that the city may acquire certain other prop-
   erty to be used in the construction of a municipal harbor, is
   within the power of the state to enact and not violative of the
   Ordinance of 1787, ceding territory to the United States, or
   sec. 1, art. IX, Const. Wis., in that the grant authorized was
   not for the promotion of the interests of a private corpora-
   tion, but was made in the interests of a public corporation in
   aid of navigation.  pp. 451, 456.
3. The fee of lands under navigable waters in Wisconsin may not
   be granted by the United States to a private person for purely
   private purposes, as the United States never had title in the
   Northwest Territory to the beds of lakes and navigable
   waters except in trust for public purposes; and whatever con-
   cessions the state, to whom this trust was transferred, may
   make without violating its essentials, can properly be made
   to riparian owners.  pp. 439–441.
4. The projection of a wharf or pier for a distance of 1,500 feet
   into Lake Michigan cannot be held an obstruction to naviga-
   tion but an aid thereto, in view of the vastness of the area of
   the Great Lakes and the primary purpose which they sub-
   serve.  p. 447.
5. The state could not grant land presently submerged in Lake
   Michigan to a private corporation, but if the reason of the

grant is not a private one but public in its nature and the grant is but a mere part of a larger purely public scheme designed to enable the city of Milwaukee to construct an outer harbor in aid of navigation and commerce, it is valid. p. 451.

6. The state, in administering the trust doctrine as relating to navigable waters, within the meaning of the Ordinance of 1787, and incorporated in sec. 1, art. IX, Const., need not forever be quiescent to the extent of leaving the shores of Lake Michigan in all instances in the same condition and contour as they existed prior to the advent of the white civilization. p. 451.

APPEAL from a judgment of the circuit court for Milwaukee county: OTTO H. BREIDENBACH, Circuit Judge. *Affirmed.*

The action is brought by the plaintiff to quiet title in and to the lands referred to in the findings, hereinafter set forth. From an examination of such findings the issuable facts will be readily perceived; and the conclusions of law following the findings present concisely the legal issues involved and determined.

*"Findings of fact.*

"1. That the Illinois Steel Company is the owner of a large tract of land immediately north of Wilcox street in said city of *Milwaukee,* which is necessary to be used in the construction of the harbor contemplated by the city of *Milwaukee,* upon a portion of which land is located a large slip and dock and unloading facilities used by the said Illinois Steel Company in the operation of its plant, at which boats loaded with material used by said Illinois Steel Company in its operations dock and unload such material.

"2. That the lands of the said Illinois Steel Company lying north of Wilcox street are necessary for the construction and development of the harbor planned by said city of *Milwaukee,* to acquire which the said city of *Milwaukee* has instituted condemnation proceedings.

"3. That the said city of *Milwaukee* and the said Illinois Steel Company have entered into an agreement in compromise and settlement of such condemnation proceedings, whereby, in order to preserve the slip, dock, and shipping facilities of the said Illinois Steel Company, the city has

agreed to convey to the Illinois Steel Company the submerged lands in Lake Michigan immediately adjacent to the property of the said Illinois Steel Company between Wilcox street extended and Russell avenue extended and within fifteen hundred (1,500) feet of the said shore line of said Lake Michigan, a portion of which is to be filled by said Illinois Steel Company and a slip and dock constructed thereon and the necessary unloading facilities, equivalent to those now owned by said Illinois Steel Company at its present slip and dock, placed thereon, which filling, the construction of the slip and dock, and the cost of removing and installing the unloading facilities are to be paid for by said city of *Milwaukee*.

"4. That the carrying out of the contract between said city of *Milwaukee* and the Illinois Steel Company will enable the city of *Milwaukee* to acquire the lands of the said Illinois Steel Company north of Wilcox street much cheaper than by condemnation or purchase and save the city of *Milwaukee* a sum in excess of three million dollars ($3,000,000).

"5. That the area between Wilcox street extended and Russell avenue extended and the shore line of Lake Michigan, adjacent to the lands of the Illinois Steel Company, extending for fifteen hundred (1,500) feet therefrom into Lake Michigan, is not used for purposes of commerce either in fishing or in navigation; that there are no docks in, upon, or immediately adjacent to any portion of said area; that there are no industries south of said Russell avenue requiring any use of said area for purposes of navigation; that the average depth of the water in said area at a point fifteen hundred (1,500) feet distant from and parallel to said shore line is not to exceed twenty-six (26) feet; that the boats now used on said Lake Michigan require for practical and economical use a depth of not less than twenty-six (26) feet of water, and the slips to be constructed in the proposed harbor of the city of *Milwaukee* will have a carrying depth of thirty (30) feet; that the said area is not used for recreational purposes except by an occasional fisherman, swimmer, sail or row boat, and that no general or common use of said area for recreational or business purposes is made by the public or any member of it.

"6. That the filling of said area and the use thereof by the said Illinois Steel Company will not injuriously affect or

result in any impairment of the interests of the State of Wisconsin, nor of the public or any member of the public, in the waters now covering said area or the use or enjoyment of the waters adjacent thereto.

"7. That any or all of the uses now made of said area can be made of the waters immediately adjacent to said area on the east and south without any impairment or inconvenience.

"8. That by the construction of the slip, dock, and unloading facilities on the land made by filling a portion of said area as proposed in and by said contract between the said city of *Milwaukee* and the Illinois Steel Company, the navigation in said area will be greatly improved and that the fishing will also be improved; that the filling of said area will protect the harbor works to be constructed by the said city north of Wilcox street and will improve that portion of said Lake Michigan as a harbor, and that the United States government has issued permits for the work, showing that the same will be an aid to commerce and navigation.

"9. That the owners of the lands immediately adjacent to the area proposed to be filled are the city of *Milwaukee* and said Illinois Steel Company and that such owners will not be injuriously affected by the proposed filling and the conveyance of said area to said Illinois Steel Company.

"10. That the recital of facts in section 2 of chapter 285 of the Laws of 1923 are all true, and that such filling and conveyance, because of the resultant development of the harbor of the city of *Milwaukee,* will benefit such lands and will promote the rights and interests of the State and of the public in and to the waters and submerged lands adjoining said area.

"11. That the summons was properly drafted and published to cut off the rights of all non-appearing and unknown claimants.

*"Conclusions of law.*

"1. That neither the State of Wisconsin, in its own right, or in the right of the public whom it represents, as trustee, or the public, have any claim to or right, title, or interest in the said submerged lands between Wilcox street extended and Russell avenue extended between the property of the Illinois Steel Company and a line parallel thereto and extending into Lake Michigan a distance of fifteen hundred (1,500) feet between said Wilcox street extended and Russell avenue

extended, which were not disposed of in chapter 358 of the Laws of Wisconsin of 1909 and chapter 285 of the Laws of 1923, both of which are valid acts, being proper exercise by the State of the power to aid navigation at the expense of slight swimming, infrequent fishing, and occasional small craft navigation as to a small portion of a large harbor.

"2. That the said city of *Milwaukee* because of said two laws is the owner in fee simple of said lands with full right, power, and authority to fill the same or cause the same to be filled and convey same to the said Illinois Steel Company to be reclaimed and in the aid of commerce and navigation to construct dock and wharf facilities on any of said land and to use any or all of said land for any proper purpose, as is provided in chapter 285, Laws 1923.

"3. That the said State of Wisconsin, as trustee, or otherwise, and the public and any and all unknown claimants or owners should be barred against having or claiming any right or title in, to, or over said lands and the waters over the same."

Judgment having been entered in accordance with the findings, the defendant State of Wisconsin has taken this appeal.

Further facts will be referred to in the opinion.

For the appellants there was a brief by the *Attorney General* and *Michael J. Dunn, Jr.,* assistant attorney general, and oral argument by *Mr. Dunn.*

*John M. Niven,* city attorney, and *Clifton Williams,* special assistant city attorney, for the respondent.

DOERFLER, J. Millions of dollars are involved in the decision herein. The realization of a fond dream of a municipality to construct a gigantic municipal harbor also depends upon the outcome; but over and above all, we are called upon to determine the right of Wisconsin, as a sovereign state of the Union, to cede to the metropolis of the state property held in trust by it, to promote the interests of navigation and commerce, with an authorization to convey a part of this trust property so ceded to a private industrial corporation, in order that the municipal project can be accomplished. The

gravity of the main issue thus outlined is accentuated because it presents a new phase of the so-called trust doctrine which has not heretofore directly come before this tribunal for adjudication, although it has frequently been decided by the supreme court of the United States and by the tribunals of last resort in a large number of the states. It is therefore with a profound sense of responsibility that we approach the consideration of the issues involved.

All litigated cases must be decided according to law, either statutory or the common law. Where the legislature has enacted statutes within the proper field of legislation and not violative of the provisions of the federal and state constitutions, its edicts are supreme, and they cannot be interfered with by the courts; and where legal principles have been laid down by the courts in the proper exercise of their judicial functions and have continued in force for such a period as to create vested rights, such principles are clothed with a force possessed by a statutory enactment, and should be recognized and applied until the law-making body sees fit either to abrogate or modify them. The courts are no respecters of individuals, as such, whether they be powerful from a material standpoint, or are humble. As the immutable laws of nature cause the rain to fall upon the rich and the poor alike, the powerful and the weak, so it is the aim of the courts to emulate that highest law in the administration of justice; and while, as has been said, courts are oftentimes overawed by the enormity of the issues, their solution, as in minor cases, depends upon the application of laws, principles, and sound logic.

The State of Wisconsin was carved out of the great Northwest Territory ceded to the United States under the Ordinance of 1787. This ordinance in part contained the following provision:

"The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the

inhabitants of the said territory as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor."

This provision of the ordinance, in substantially the same language, has been incorporated into our constitution, and forms a part of what is known as sec. 1, art. IX, thereof. It is upon this provision of the ordinance and of the constitution that the trust doctrine laid down by the decisions of this court and many of the other courts of the country has found its inception.

The State of Wisconsin is bounded on the north by the waters of Lake Superior; on the east by those of Lake Michigan; on the west by the Mississippi river; and included within its confines are several thousand inland lakes and rivers. The vastness of the domain, therefore, ceded to the State by the United States pursuant to the ordinance can readily be appreciated; and it is thus not surprising that from the earliest day of the adoption of our constitution, down to the present day, numerous questions have arisen involving the rights of the State, of the federal government, and of individuals in and to these waters and to the title of the lands thereunder, and this court, as will appear from its decisions, has conscientiously and thoroughly considered the issues involved and has declared the principles, many of which are so firmly intrenched in the jurisprudence of this State as to be binding upon us for all time, unless legally abrogated or modified by the legislature in its proper field of legislation.

A number of the opinions of the court at an early date were rendered by such giants in the law as Chief Justices RYAN and DIXON, and at a subsequent period by the late Justice MARSHALL. In the realm of jurisprudence in this country, no jurist, in our humble opinion, occupied a higher position than did Chief Justice RYAN. He was a thorough student, conscientious and industrious, and learned in the law, and his logic and diction were so profound that his

opinions for years were held up to students of the law in the large universities of this and other countries as models. In the case of *Diedrich v. Northwestern U. R. Co.* 42 Wis. 248, and in *Cohn v. Wausau Boom Co.* 47 Wis. 314, 2 N. W. 546, this court, by Ryan, C. J., established as the law of this State most of the legal principles which are involved in and are determinative of the issues of this case, and special consideration will be given to these decisions further on in this opinion.

Within a short distance of the harbor entrance built by the federal government there is a confluence of the three rivers flowing through the city, viz. the Milwaukee, the Menomonie, and the Kinnickinnic. These rivers have been dredged from the point of confluence to an extent necessary to make them navigable by large craft arriving in and leaving from the port of *Milwaukee*. Docks have been constructed on both sides of these rivers to facilitate the loading and unloading of the boats, and along and abutting these docks have been erected and maintained many of the largest manufacturing and distributing plants in the city. The city itself has a population of over half a million of people, and there is a large urban population adjoining the city on three sides, amounting to considerably over 100,000, which, together with the city proper, constitutes what is known as the Greater *Milwaukee*. The city is bounded on the east by the Milwaukee bay, a natural harbor, protected on its westerly, northerly, and southerly shores by high bluffs, and this bay has been pronounced by many as one of the finest harbors in the United States, comparable in its beauty only by the Bay of Naples. The lake itself is a body of water about 350 miles in length, and has an average width of about eighty miles. This large body of water, connected as it is with the other Great Lakes, was designed by nature as an ideal avenue of commerce for both state and interstate traffic.

The Great Lakes are not as a rule suitable for navigation

by small craft.   In the early days, when practically the only inhabitants of the lands bordering these lakes were the Indians, they served the purposes of navigation in a very limited and restricted sense.   For many years after Wisconsin was settled by the white race, navigation on these lakes was largely confined to small boats, and the time is still within the memory of most people where hundreds of these crafts, with their white sails spread to the breezes, were everywhere visible from the shores.   These sailing boats did not compare in size with the modern sea-faring craft, and by reason of their construction could readily be conveyed to all parts of the inner harbor of *Milwaukee*.   The period of the sailing vessel has passed, and its presence in the Great Lakes today is more of a curiosity than the old horse-drawn vehicles upon the streets of a city.   For considerably over a quarter of a century, steamboats, with ever-increasing size and capacity, have displaced the sailing vessel, and with the advent of these large boats the usefulness and facility of the inner harbor have gradually decreased.   Numerous steam crafts, engaged both in passenger and freight transportation, now traverse the Great Lakes, and they are of a size that would readily enable them to engage in ocean traffic.   The turning basins in the inner harbor were not designed to accommodate the large crafts of modern day, and it is therefore only with great difficulty that these large steamers are enabled to reverse their course after arriving in the harbor.

Every one is familiar with the gigantic project which has been agitated for a period of over quarter of a century, and which is designed to afford means by which the Atlantic Ocean and the Great Lakes may be connected and brought into proximity with each other.   The feasibility of this large project has met with the stamp of approval of many of the greatest experts in the country, and it is highly probable that in the near future this cherished scheme will find its realization.   It presents a consummation devoutly to be hoped for by all of the cities bordering upon the Great Lakes.   The

installation of a car-ferry system, by which trains of cars laden with freight are propelled directly from tracks on land to tracks on steamers, to be then conveyed across Lake Michigan, has enabled *Milwaukee* and other cities located upon the western shore of Lake Michigan to compete in freight rates with Chicago and other cities.

The foregoing facts are referred to in part in order to demonstrate the marked changes in navigation upon Lake Michigan and other similar bodies of water. The vastness of the area and the depth of the waters constitute factors which are illustrative of the difference existing between navigation on Lake Michigan and navigation on the inland lakes. The waters of Lake Michigan are naturally designed primarily to serve commercial purposes, while the waters upon the inland lakes are mainly resorted to for recreation. True, most of these inland lakes, as has been held, are navigable in fact, but they are resorted to principally for navigation in connection with recreation, and for fishing and hunting, which are incidents thereto.

It requires no argument to demonstrate that *Milwaukee* and the State are confronted with a situation which may result disastrously to their material prosperity and welfare unless the scheme here outlined will meet with the approval of this court. To reconstruct the inner harbor to meet the developments of modern navigation on the Great Lakes would involve an expenditure of money and a burden to the taxpayers which is appalling. *Milwaukee* is one of the great ports on the Great Lakes. It is the largest distributor of coal, not only upon the chain of lakes, but in the middle west. Located within the confines of Greater *Milwaukee* is situated the largest machine and engine building plant in the world; it excels all other cities in its tanning industries; the products of its hosiery mills are sent forth to all parts of the world; and it has numerous other varied important industries, and in general is considered one of the great industrial

centers of America. It affords a ready market for raw materials designed for manufacture. It is the great market of Wisconsin for the products of the farm. Its prosperity and welfare are directly intertwined and interwoven with that of the entire State. About ninety per cent. of the inheritance taxes levied in Milwaukee go to the State, and as an illustration of what it contributes to the State in such taxes, attention is called to the enormous tax of about $2,000,000 levied upon the estate of one individual, the late J. I. Beggs, a resident of *Milwaukee* at the time of his death. The modern highways which have made Wisconsin famous are largely paid for out of taxes levied in *Milwaukee,* and its contribution to the maintenance of the educational system of this State is an important factor which has built up and maintains this system, and which is recognized the world over for its efficiency. Under these circumstances it can hardly be successfully argued that the State is not interested in the great *Milwaukee* harbor project. In order to enable the construction of the great transcontinental railway lines, the federal government has granted an empire to facilitate their building. Cities and counties have authorized large bond issues in aid of railway construction. The federal government each year appropriates many millions of dollars in aid of harbor construction and of breakwaters, and many other contributions to the interests of transportation, which includes navigation, could be readily mentioned to demonstrate that an aid to a city, though local in its nature, involves the public welfare not only of the State but of the entire nation.

Under these circumstances it is not surprising that the State of Wisconsin has come to the realization of the situation which confronts it and which has induced it to lend its stamp of approval to the construction of the proposed outer harbor. When the inner harbor was constructed no one was in a position to forecast the great changes which have come

about in navigation.   Early in the present century patriotic
citizens of *Milwaukee,* like William George Bruce, unself-
ishly devoted their time and means to the accomplishment of
this large scheme.   They are men of vision and of the high-
est type of American citizenship.   Actuated by the great
possibilities of a larger and more prosperous State and me-
tropolis, they sensed the impending construction of the great
waterway.   The legislative governing body of the State as
early as 1909 realized what the outer harbor would mean to
the State, and passed the statute which will be hereinafter
set forth.   Since that time, the experts employed on the
scheme, by the aid of the Association of Commerce of Mil-
waukee and other prominent public bodies and citizens, have
further developed the project, so that in order to meet a
realization they have proceeded to outline plans and speci-
fications and to condemn property.   The burden, however,
was great and nigh insurmountable, and, realizing this, the
State in the year 1923 passed the statute which gave re-
newed life to the project and stimulated all efforts towards
a successful consummation.

Legal obstacles appeared upon the horizon, and in order
to test the legality of the conveyance to the Illinois Steel
Company, and the title to be conveyed, the present action was
begun.   The State does not contest this judgment in the
ordinary spirit of a litigant.   The Attorney General is heart
and soul in sympathy with the judgment of the lower court,
but feels it incumbent upon him to present the matter to this
court in order that the legal questions involved may be finally
adjudicated.

The statutes involved are the following:

"No. 512, A.                    Published June 12, 1909.
            "Chapter 358.

"An Act to cede to the city of Milwaukee certain submerged
     lands described therein lying along and adjacent to the
     city of Milwaukee and extending fifteen hundred feet into
     Lake Michigan on the eastern boundary of the city of

Milwaukee between the present harbor entrance and Russell avenue extended, for dock and wharf purposes and railway terminals.

"*The People of the State of Wisconsin, represented in Senate and Assembly, do enact as follows:*

"Section 1. All the right, title and interest of the State of Wisconsin in and to the following land along and adjacent to the shore of Lake Michigan and partly submerged, constituting the bed of Lake Michigan, on the eastern boundary of the city of Milwaukee and extending into Lake Michigan for fifteen hundred feet and lying between the present harbor entrance of said city and Russell avenue extended in said city, are hereby granted and ceded to said city of Milwaukee to be held and used by said city for public slips, basins, docks, wharves, structures, roads, highways, railroads and railways, and railway terminals and lake and rail facilities and spurs for shipping.

"Section 2. This act shall take effect and be in force from and after its passage and publication.

"Approved June 10, 1909."

"No. 348, S.                    Published June 22, 1923.
"Chapter 285.

AN ACT to amend chapter 358 of the Laws of 1909, relating to the cession to the city of Milwaukee of certain submerged lands described therein, for dock and wharf purposes and railroad terminals, and to authorize the filling in and reclaiming of certain portions of said lands and the conveyance by said city of Milwaukee thereof to the owners of the shore land adjacent thereto.

"*The People of the State of Wisconsin, represented in Senate and Assembly, do enact as follows:*

"Section 1. Chapter 358 of the Laws of 1909 is amended to read: (Chapter 358, Laws of 1909) Section 1. 1. All the right, title and interest of the State of Wisconsin in and to the following land along and adjacent to the shore of Lake Michigan and partly submerged, constituting the bed of Lake Michigan, on the eastern boundary of the city of Milwaukee and extending into Lake Michigan for fifteen hundred feet and lying between the present harbor entrance of said city and Russell avenue extended in said city, are

hereby granted and ceded to said city of Milwaukee to be held and used by said city for public slips, basins, docks, wharves, structures, roads, highways, railroads and railways, railway terminals and lake and rail facilities and spurs for shipping.

"2. *That portion of said lands above described lying between Wilcox street extended and Russell avenue extended, being unnecessary for purposes of navigation or other public uses or to preserve to the people the enjoyment of the waters upon or adjacent thereto, and the use hereinafter authorized neither injuriously affecting nor resulting in any impairment of the interest of the public in said waters but being in the interest of the public and in aid and improvement of the public use of the waters and lands for purposes of navigation and other public uses, and for the protection of the public docks, wharves, and harbor facilities which may be constructed adjacent thereto, the said city of Milwaukee is hereby authorized and empowered to fill in and reclaim, or agree to fill in and reclaim or cause to be filled in and reclaimed, any or all of said lands, and to convey to the owner or owners of the shore land adjacent thereto any or all of said lands in fee simple, either before or after filling in and reclaiming the same, in exchange for and in settlement of damages, in whole or in part, for the taking of lands of said owner or owners on the main land between said harbor entrance and Wilcox street extended which said city may deem necessary and more advantageous for use by it for the purposes set forth in subsection 1 hereof, and such owner or owners are authorized and empowered to fill in and reclaim any unfilled portions of said land and, in aid of commerce and navigation, to construct dock and wharf facilities on any of said land and to use any or all of said land for any proper purpose.*

"Section 2. This act shall take effect upon passage and publication.

"Approved June 19, 1923."

A mental picture of this gigantic project may be realized from a copy of one of the plats, being an exhibit in this case, and which is now reproduced upon a miniature scale. (See page 437.)

Milwaukee v. State, 193 Wis. 423.

Referring to the preceding plat, it will be observed that the portion thereof included within the quadrangle colored blue represents the land authorized by the statute to be conveyed by the city to the Illinois Steel Company; and the part of the map colored green represents the area which the Steel Company, in the exchange, must convey to the city. As a part consideration of this transfer, the city is also authorized and obligated to fill in and to reclaim all or the greater part of the lands to be conveyed to the Steel Company. The land represented upon the plat by the blue quadrangle, as will appear from the facts found by the legislature under the act of 1923, no longer serves the purposes of navigation or commerce. The legislature further found that the proposed conveyance will not affect materially the rights of the public in its free use of the waters for either navigation purposes or the incidents connected therewith. Furthermore, it is found that the proposed structures within the area to be conveyed to the Steel Company will afford protection to the proposed docks, wharves, piers, and slips forming a part of the plan involved in the construction of the outer harbor of the city, and will therefore serve the city in its general scheme, which is concededly designed to promote navigation and commerce upon Lake Michigan. (See Plat.)

Therefore, the vital and crucial issue raised involves the right of the State, in its authorization to the city, to convey a portion of the submerged land to a private corporation like the Steel Company, such conveyance being an essential requisite of the entire plan to aid the city in the construction of its proposed outer harbor, in aid of navigation and commerce. Briefly stated, we are concerned herein with a proper construction of the trust doctrine under and pursuant to which the State holds the title to these submerged lands in trust, in accordance with the provisions of the Ordinance of 1787 and the constitutional provision above quoted.

We are therefore dealing first with the interests and title of the State; second, the interests of the United States; third, the interests of the city of *Milwaukee;* fourth, the interests of riparian owners; and fifth, the interests of the public at large; and when we consider the rights and interests of all of these parties, we embrace all interests involved.

The text-books, such as Gould on Waters and Farnum on Waters, contain interesting, learned, and exhaustive discussions upon this subject. The reference books like the Encyclopedia of Law and Ruling Case Law, written and compiled by the most eminent and learned authorities upon the subject of waters, are also replete in their discussions and are helpful as a guide. Many of the adjudicated cases cover to a large extent the entire field, all evincing and manifesting the importance of the subject herein considered. The early development of the principles involved originated in England at the time of the very beginning of our common-law system of jurisprudence. The divergent views held by these text-book and reference writers and by the courts, to say the least, are bewildering and are difficult of reconciliation. This court, however, from time to time has considered all of the various phases, and has evolved certain definite principles which are binding upon us and which we will endeavor to follow.

In *McLennan v. Prentice,* 85 Wis. 427, 443, 55 N. W. 764, it is said:

"In the absence of express and competent grant to some other, the state is the owner of the fee of all lands under navigable waters in the Great Lakes, but in trust only for the public uses and purposes of navigation and fishing, and they may not be granted by the United States to a private person for a *purely private purpose;* that, the title to such lands being in the state, 'they are subject to state regulation and control, under the condition, however, of not interfering with the regulations which may be made by Con-

gress with regard to public navigation and commerce, . . . *state control and ownership therein being supreme,* subject only to the paramount authority of Congress in making regulations of commerce and subjecting the lands to the *necessities and uses of commerce.' Hardin v. Jordan,* 140 U. S. 371, 381, 382, 11 Sup. Ct. 808, 838. The common-law rule in regard to tide waters has been extended to our Great Lakes, which are treated as inland seas, and it is held that it depends on the law of each state to what extent this prerogative over lands under the water shall be exercised. In the case of *Barney v. Keokuk,* 94 U. S. 324, 334, it was held that '*it is for the several states themselves to determine this question, and that if they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections.'* But 'it has never been held that the lands under water in front of the lands of riparian owners are reserved to the *United States,* or that they can afterwards be granted out to other persons, *to the injury of the original grantees.* The attempt to make such grants is calculated to render titles uncertain and derogate from the value of natural boundaries, like streams and bodies of water.' *Hardin v. Jordan, supra.*"

See, also, *Fox River Paper Co. v. Railroad Comm.* 47 Sup. Ct. 669, a decision handed down by the supreme court of the United States on May 31, 1927, case No. 492; *Kaukauna W. P. Co. v. Green Bay & M. C. Co.* 142 U. S. 254, 272, 277, 12 Sup. Ct. 173; *Packer v. Bird,* 137 U. S. 661, 669, 11 Sup. Ct. 210.

*It will be noted from the foregoing quotation that these submerged lands may not be granted by the United States to a private person for purely private purposes.* This is so because, as is said in *Illinois Steel Co. v. Bilot,* 109 Wis. 418, 426, 84 N. W. 855, 85 N. W. 402:

"The United States never had title, in the Northwest Territory out of which this state was carved, to the beds of lakes, ponds, and navigable rivers, except in trust for public purposes; and its trust in that regard was transferred to the state, and must there continue forever, *so far as necessary*

to the enjoyment thereof by the people of this common-wealth. *Whatever concession the state may make without violating the essentials of the trust, it has been held, can properly be made to riparian proprietors.*"

It is clear from what is said in the *Bilot Case,* which involved the validity of a patent from the United States to certain lands abutting Lake Michigan, that under the Ordinance of 1787, pursuant to which these lands were transferred to the federal government in trust, the United States merely held title thereto as an intermediary trustee, charged with the trust to hold and to convey to the various states as they were respectively carved out of the great Northwest Territory.

The language above quoted from the *Prentice Case,* pursuant to which the states must themselves determine the extent to which the prerogative over lands under the water shall be exercised, explains the divergent views contained in the opinions of various states upon the subject. Wisconsin, therefore, as it had a right to do, and as is recognized by all the authorities, when the constitution was adopted, placed itself fundamentally on record in favor of the trust doctrine, and we must therefore reckon with this doctrine at every phase of the discussion of the issues in this case.

In *Diedrich v. Northwestern U. R. Co.* 42 Wis. 248, 262, it is held: "Riparian rights proper are held to rest upon title to the bank of the water and not upon title to the soil under the water; riparian rights proper being the same, whether the riparian owner owns the soil under the water or not." See, also, *Stevens Point Boom Co. v. Reilly,* 46 Wis. 237, 49 N. W. 978; *McLennan v. Prentice,* 85 Wis. 427, 55 N. W. 764; *Doemel v. Jantz,* 180 Wis. 225, 193 N. W. 393. Such rights did not originate pursuant to any statute, but were developed by judicial construction in the course of litigation, and they grew out of the necessity of the situation.

It is then held in the *Diedrich Case* that "A riparian owner upon navigable water, . . . unless prohibited by local law, has the right to construct in shoal water, in front of his land, proper wharves or piers, in aid of navigation, and at his peril of obstructing navigation, through the water far enough to reach actually navigable water; this being held to further the public use of the water, to which the public title under the water is subordinate." See, also, *Cohn v. Wausau Boom Co.* 47 Wis. 314, 2 N. W. 546; *A. C. Conn Co. v. Little Suamico L. M. Co.* 74 Wis. 652, 43 N. W. 660; *McLennan v. Prentice,* 85 Wis. 427, 55 N. W. 764; *Illinois Steel Co. v. Bilot,* 109 Wis. 418, 84 N. W. 855, 85 N. W. 402; *Doemel v. Jantz,* 180 Wis. 225, 193 N. W. 393.

This is also a right possessed by a riparian owner and incident to his ownership, and is recognized by the courts in order that the owner of the upland may be afforded an opportunity of promoting navigation and of obtaining the highest degree of use permissible in the enjoyment of his riparian rights. It must be conceded that the construction of wharves or piers out to navigable water may result in some interference with or obstruction to navigation or the incidents thereof, yet the practical increased degree of navigability of the water by reason of the construction of such wharves or piers is of such great importance that these structures are tolerated and recognized in the law, notwithstanding the trifling interference with navigation they may produce. Briefly speaking, the inferior rights are deemed subordinate to the greater rights.

Further on in the *Diedrich Case* it is said:

"As a right of *necessity* when water, navigable or not navigable, is by natural causes wearing away and intruding upon its banks, the riparian owner, whether or not he own the soil *usque ad medium filum aquæ,* may, *as against the public,* at his peril of obstructing the public use when the water is navigable, and at his peril of the necessity, intrude,

as far as may be necessary, into the water, for the construction of works necessary to the protection of his land against the action of the water."

Here again we have an express right in the riparian owner, recognized by reason of the necessity of the occasion, which right also, as in the case of the building of piers or wharves, results from a judicial construction of the subject of riparian rights. The opinion in the *Diedrich Case* proceeds as follows:

"In speaking of water as navigable or not navigable, we do not use the words in their sense at the common law. Waters at the common law were called navigable, only when affected by the ebb and flow of the tide. Of course in this state, bounded on one side by a great fresh-water sea, and on another by a great river, with its confluents constitutes perhaps the most extensive inland navigation in the world, and having within it many streams and bodies of water capable of navigation and naturally navigated, there is no water subject to the ebb and flow of the tide, or called navigable at the common law. Here, therefore, the restricted sense of the word 'navigable,' at the common law, is wholly inappropriate to the actual condition of things."

It will be immediately observed by the reader that the definition of the term "navigability" has by this court been extended to a degree not recognized by the common law of England, and such extension is recognized by our courts and by other courts because the old common-law doctrine is unsuitable as applied to conditions existing in this and many other states.

At various seasons of the year the waters of Lake Michigan and of the inland lakes recede from the high-water mark, with the result that lands at times under water become exposed. In the case of *Doemel v. Jantz,* 180 Wis. 225, 193 N. W. 393, it was held:

"The public has no lawful right to enter and travel upon that portion of the shore of an inland navigable meandered lake lying between the ordinary high and low-water marks;

and upon such an entry the riparian owner may maintain an action of trespass."

In that case it was also held that riparian rights became vested in the owners of the uplands bordering on navigable waters at an early date in the history of Wisconsin, and have been considered as so vested ever since. The free and exclusive right of the riparian owner to enter upon the waters abutting his lands is a valuable right; it enhances the market value of his property; for such rights he has been taxed; and the owner of such riparian rights can only be deprived thereof by sale or condemnation. In the opinion in the *Doemel Case* it is also said:

"During certain periods of the year when precipitation is large and when the waters of the lakes are swelled by the increasing inflowing volumes coming from springs, rivers, creeks, and the flowage of surface water and the precipitation in the form of rain, the lake exercises its dominion over the land to the high-water mark. This dominion, however, is not permanent. Upon the seashore, where the waters are affected by the tide, it is intermittent. As to inland lakes and rivers, such assertion of dominion on the part of nature is periodical. So that it would appear but logical to hold that when nature, in pursuance to natural laws, holds in its power portions of the land which at periods of the year are free from flowage, then during such periods the strip referred to is subject to all the rights of the public for navigation purposes. On the other hand, when the waters recede these rights are succeeded by the exclusive rights of the riparian owner. So that during periods of high water the riparian ownership represents a qualified title, subject to an easement, while during periods of low water it ripens into an absolute ownership as against all the world with the exception of the public rights of navigation. . . ."

So that we have here presented in the *Doemel Case* a very unique situation, which follows the laws of nature, and this court, as to the exposed strip, was impelled to hold as it did in order to protect that exclusive right which a riparian owner has and must have on all occasions when he desires

to enter upon the water from his upland,—a right of ne-
cessity not granted by any statute, but resulting from judicial
construction.

In the case of *Pewaukee v. Savoy,* 103 Wis. 271, 79
N. W. 436, it was held, as will appear from paragraphs 2
and 3 of the syllabus, as follows:

"The title of the state to submerged lands under the
waters of navigable lakes will be extended so as to include
lands covered by an artificial raising of the level of the lake,
if such artificial condition be continued so long as to become
the natural condition."

"If a person artificially raise the level of the waters of a
navigable lake so as to flood his own lands, the public rights
in the lake will be correspondingly extended so long as such
artificial condition exists."

The *Savoy Case* perhaps is the only case in this state
which holds this doctrine, and a reading of the opinion will
convince one that it is founded on good logic and authority.
In the opinion it is held:

"When we say that the new level of the lake has become
its natural level, we say that the title to all the submerged
lands in the present condition of things is *in the state;* that
the entire body of water is subject to the common right of
fishing and navigation and to the other incidents of navi-
gable waters, and that the title to lands bordering on the
lake stops at precisely the same line that would govern if the
water, in a state of nature, reached to the height of its
artificial condition."

The law thus enunciated follows not from the act of the
legislature, but from the decisions of the court. Like the
other incidents hereinbefore referred to, it follows from the
necessities of a given situation.

The holding in the *Doemel Case, supra,* is a logical corol-
lary from the well established and recognized doctrine that,
where relictions occur, the riparian owner obtains title to
the exposed land.

The foregoing authorities are chiefly quoted to elucidate

the nature of the trust title.  Nowhere within the realm of titles do we find in our jurisprudence a parallel to the ever-changing and shifting title and rights of the State and the riparian owners as is manifested in regard to these titles of lands under the waters of navigable lakes.  The elasticity and flexibility of such titles are made to conform to the ever-changing order of things and to meet every new situation as it arises.  Neither can it be said that the principles above laid down in the *Diedrich. Case,* and other Wisconsin cases above referred to, originated in this State.  Their development constitutes a part of the history of such titles, both under the common law of England and that of this country.  The supreme court of the United States and our own court have ever been ready and inclined to so construe this trust title as to promote justice between all the parties interested therein, and particularly to preserve the interests of the State in the trust.  The broad principles of the common law have been applied, without exception or stint, to serve public interests, and by that is meant the greater public interests, when it came to consider the purposes of the trust title, which is restricted under the ordinance and the constitution by the decisions of this court solely in so far as navigation is concerned.  We speak of navigation rights, of rights of hunting, fishing, and recreation, but the foundation of all of these rights was originally based upon navigation, and the restriction upon the absolute title which constitutes a trust title, even at the present time, is primarily based upon navigation, and the incidents thereto in the early common law of England were added from time to time as the necessities of the occasion required.

The term "navigation" itself in its definition is quite as indefinite and shifting as the so-called trust title.  It is one thing upon the Wisconsin and many other rivers when considered in connection with the uses to which such rivers by nature are primarily adapted.  At an early day the Wiscon-

sin and many other rivers served the purpose chiefly of affording a means for the floating of logs to the mills or to the markets. The term, when applied to the vast majority of our inland lakes, imports the use of such lakes for recreation, hunting, fishing, and swimming, and in most instances they serve no purpose to promote commerce. On the other hand, when a large body of water like Lake Michigan, one of the chain of Great Lakes, is considered, we arrive at the inevitable conclusion that this lake, and these lakes, forming practically one great inland sea, are designed by nature primarily for the exploitation of commerce, not only by and between the public of a given state, but by that of all of the states bordering upon the great chain of lakes. So that it becomes evident that the term "navigation," in its definition and its application, is quite as shifting as the very title under and pursuant to which the State is the owner thereof in trust.

A wharf or pier extended out into one of our inland lakes for a distance of 1,500 feet could not be held to serve the purposes of promoting navigation; on the contrary, it would be considered an obstruction thereto. On the other hand, when we consider the vastness of the area of these Great Lakes, such as Lake Michigan, and the primary purpose which they subserve, such a projection cannot be held an obstruction to navigation, but an aid thereto. For the State to attempt to cede to an individual or corporation a stretch of land under water adjoining the uplands of an inland navigable lake would on its face clearly violate our constitutional provision; but when it comes to Lake Michigan, and when we consider the main purpose of this large body of water, such a cession, when made in the interests of navigation, presents an entirely different aspect.

It has been shown by the evidence in this case that navigation as it is pursued upon Lake Michigan at the points herein referred to, requires a construction of wharves and piers ·

which extend out from the shore a distance of 1,500 feet.
The evidence also is persuasive that the land under water
represented by the quadrangular plot colored blue, is not
necessary for navigation as that term is used when applied
to Lake, Michigan; that the public interests will not be sub-
served by the retention of such area in its present condition;
that no material rights of riparian owners, outside of the
Steel Company, will be affected; in other words, briefly
stated, that this area can be parted with by the State to the
Steel Company without damage to other riparian owners or
to the public; that the filling in of this area and the construc-
tion of docks and wharves by the Steel Company upon the
property so proposed to be ceded will protect the outer
harbor of the city of *Milwaukee,* and this becomes clearly
apparent from an inspection of the map incorporated herein
and heretofore referred to.   It must be presumed that the
legislature of the State, being its supreme law-making body,
has made a careful investigation of the entire situation, and
has finally concluded, in the statutes above referred to, that
the findings contained in such statutes are true.  . These
findings have also been adopted and approved by the court,
and are supported by a clear preponderance of the evidence.
Representing the sovereign will and power, the State pos-
sesses all of the rights and powers originally held in sub-
merged lands on navigable bodies, both by the King and
Parliament.

This is not a case like *Priewe v. Wisconsin State Land &
Imp. Co.* 93 Wis. 534, 67 N. W. 918, where the title to an
entire navigable lake was conveyed to a private corporation
under the pretext that such lake, if drained, would promote
the interests of public health, whereas in truth and in fact,
as was held by this court, the purpose of the act was to ex-
ploit these submerged lands solely for the financial and
material benefit of the improvement company.   The scheme
in the *Priewe Case,* if consummated, would have destroyed

the entire navigability of Muskego and other lakes situated in Waukesha and Racine counties. It therefore requires no argument to demonstrate that the act upon its face was unconstitutional, not only because the alleged purpose involved deception, but because it was violative of the trust doctrine which is founded upon the Ordinance of 1787 and the constitutional provision above referred to of our State. Had the State in the *Priewe Case* authorized the conveyance of as large an area as is involved in the case at bar, it could not be sustained under the decisions of this court, because the consummation of the scheme would have materially affected the rights of the public to the navigable waters of the lakes, considering their size, depth, and the purposes for which they were primarily adapted, and the rights of riparian owners.

What has been said in respect to the *Priewe Case* is equally applicable to *In re Crawford County L. & D. Dist.* 182 Wis. 404, 196 N. W. 874. There, a considerable area would have lost its original character, leaving, however, a large tract still available for use in navigation and for hunting and fishing.

The trust reposed in the State is not a passive trust; it is governmental, active, and administrative. Representing the State in its legislative capacity, the legislature is fully vested with the power of control and regulation. The equitable title to these submerged lands vests in the public at large, while the legal title vests in the State, restricted only by the trust, and the trust, being both active and administrative, requires the law-making body to act in all cases where action is necessary, not only to preserve the trust but to promote it. As has heretofore been shown, the condition confronting the legislature was not a theory but a fact. This condition required positive action, and the legislature wisely and well discharged its duties when it enacted the statutes involved. Is it possible that the legislature, confronted with the impend-

ing danger of the destruction of a large part of the commerce of Lake Michigan (which is tributary to *Milwaukee* and other Wisconsin ports on the Great Lakes), could be said to perform its duty in the administration of the trust without taking appropriate action to relieve the situation as it did in the instant case? The occasion presented one of dire necessity, and, like this court in the adoption of the legal principles referred to in the Wisconsin cases, the legislature afforded the needed relief by enacting the statutes involved. A failure so to act, in our opinion, would have amounted to gross negligence and a misconception of its proper duties and obligations in the premises.

The title to the entire land from the harbor entrance to Russell avenue is in the Steel Company. This company is therefore the riparian owner. It controls the site which the city of *Milwaukee* needs for an outer harbor. That portion of the Steel Company's property lying between Wilcox street and the harbor entrance is needed in the construction of the municipal project. The Steel Company also owns the land lying between Wilcox street and Russell avenue.

The Steel Company is a large industrial concern, which, together with its predecessor in title, has owned and possessed this tract, with few exceptions, since the 60's in the last century. It employs an army of skilled and unskilled labor. It is a private corporation, operated for profit; but nevertheless is an important factor in the industrial life of the city and of the State. Upon the entire land now owned by it are located its steel mills and furnaces, its sidetracks for the transportation of ore and other raw material and of its finished product. The Kinnickinnic river adjoining these premises is dredged and docked, and constitutes an important factor in the water transportation of materials to and from its plant. The taking of the land necessary for the proposed outer harbor will result in depriving this company to a large extent of its railroad and water facilities.

The enormity and importance of the steel plant can be realized from the large and valuable real-estate holdings which it owns and possesses and uses in the operation of its business.

It may be conceded that a grant of this large tract of land, extending out into the lake and lying between the extension of the lines of the two streets above mentioned, could not in any view of the case be justified as a valid grant, because such grant would be a private grant for private and not public purposes. The reason, however, which lies at the basis of this grant to the Steel Company is not a private one, but is public in its nature, and the contemplated grant itself is a mere part and parcel of the larger scheme, purely public in its nature, designed to enable the city to construct its outer harbor in aid of navigation and commerce. This is apparent from the very nature of the whole project. For that reason, and that alone, the legislature has authorized the grant to the Steel Company; and the mere fact that by the enactment of these statutes and the consummation of the project the Steel Company will be enabled to relocate and readjust itself under the proposed new situation, results incidentally out of the entire scheme.

But underlying the project as a whole is the necessity of acquiring part of the Steel Company's property so that the municipal harbor may be constructed in aid of navigation; and right here we must not lose sight of the findings of the legislature and of the court that the fill which the city is required to make in the plot represented by the quadrangular area will protect from the action of the waves and water, to a large extent, the municipal harbor, and will therefore be an aid to public navigation.

It is not the law, as we view it, that the State, represented by its legislature, must forever be quiescent in the administration of the trust doctrine, to the extent of leaving the shores of Lake Michigan in all instances in the same condi-

tion and contour as they existed prior to the advent of the white civilization in the territorial area of Wisconsin. This is demonstrated by an opinion of this court rendered by Mr. Chief Justice WINSLOW in the case of *Merwin v. Houghton,* 146 Wis. 398, 131 N. W. 838. If part of the bed of a navigable river, as was held in that case, can be entirely transferred to new territory in order to consummate a proposed drainage scheme, which under the decisions of this court can only be justified upon the ground that it promotes public health, then the shores of Lake Michigan can be changed when it becomes necessary, to realize a vast enterprise purely public in its nature, designed to aid and promote navigation and commerce, which lies at the very foundation of the trust theory in this and other states. In the *Houghton Case* this court placed its stamp of approval upon such change, notwithstanding its conclusion that the change in the bed would to a considerable extent affect some of the incidents to navigation, viz. hunting and fishing. Undoubtedly, when the *Houghton Case* was decided, this court was thoroughly impressed with the idea that the trust reposed in the State was an active, administrative, and governmental trust, and one which should be administered to promote not only navigation but the public health and welfare generally.

The pioneer builders of our large cities did not realize the possibilities of their tremendous growth in interests and population. Had they done so, they would have provided for wider streets in cities like *Milwaukee,* to accommodate the congested traffic which has developed. The expense which is now entailed by condemnation proceedings to take in larger areas for street purposes in congested districts is enormous; whereas if proper provision had been made in the early days, the land necessary for such streets could have been acquired at a nominal expense. Millions of dollars have been expended in this State for straightening out and

enlarging the highways throughout the State, but in the early day highways were laid out in courses where the construction would meet with least resistance. When the State was admitted into the Union, almost its entire area was covered with an original growth of fine timber. It was thought that this timber would be inexhaustible. No one could realize at that early date the industrial development of the State and of the country, and no one did realize it; but in a period considerably less than a century, our timber interests have been exhausted, and it has now become necessary to resort to the few remaining states and to Canada for our lumber supply.

The cases involving the legal principles on navigation and the rights of riparian owners were recognized and adopted by this court at a time when no member of the court had a vision of the State's future development and progress. Our present-day conditions must therefore meet with a public judicial policy commensurate with the progressive age in which we now live; and if a modification of the early doctrines be deemed necessary, the legislature and courts should not hesitate to adopt an extension of the early principles to meet and to harmonize with the spirit of this modern, progressive age. We say "extension" of the doctrine, not "abrogation." We are dealing here with the future as well as with the past. We have learned our lessons by sad experience and have paid for them with a tremendous cost. That the Great Lakes-to-ocean waterway will find its realization in the very near future is not doubted by any enlightened, patriotic citizen of this State. The progress of the age demands it; the material welfare of the public requires it; and this State will not be found lacking when the proper time comes. The United States government for many years realized the necessity of the building of the Panama canal. Numerous attempts turned out to be futile. The enormous saving of transportation costs which resulted from its con-

summation fully justified the large expenditure necessary in its construction. It was built in aid of navigation. Other large projects in aid of navigation are today being considered by the American public, and many of them will be realized during the lifetime of the present generation. The spirit of the American people, when it once becomes aroused, cannot and will not be stifled, and it will be guided solely by a consideration of the public welfare. The State and *Milwaukee* have taken time by the forelock, and have laid their plans so that the municipal harbor when constructed will be ready not only to accommodate modern and future crafts sailing upon the Great Lakes, but the ocean traffic of the world. In what better way could the legislature provide for the public welfare of this and future generations than by the enactment of these statutes?

In 1892 the state of Illinois, one of the states bordering upon Lake Michigan, was confronted with a situation similar to that which is now before us. It was in that year that the opinion of the supreme court of the United States was rendered in the case of *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 387, 13 Sup. Ct. 110. The opinion in that case is conceded to be the leading expression of the highest court in the land upon the right of a state to grant portions of the submerged lands bordering upon the Great Lakes to a railroad corporation, in the interests of navigation and of the public welfare. The opinion of the court, rendered by that eminent jurist, Mr. Justice FIELD, from which we quote, contains the following language:

"It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or *dispose* of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so

far as may be necessary for the regulation of commerce with foreign nations and among the states. This doctrine has been often announced by this court, and is not questioned by counsel of any of the parties. *Pollard's Lessee v. Hagan*, 3 How. (44 U. S.) 212, 11 Lawy. Ed. 565; *Weber v. Board of Harbor Comm'rs*, 18 Wall. (85 U. S.) 57, 21 Lawy. Ed. 798.

"The same doctrine is in this country held to be applicable to lands covered by fresh water in the Great Lakes over which is conducted an extended commerce with different states and foreign nations. These lakes possess all the general characteristics of open seas, except in the freshness of their waters, and in the absence of the ebb and flow of the tide. In other respects they are inland seas, and there is no reason or principle for the assertion of dominion and sovereignty over and ownership by the State of lands covered by tide waters that is not equally applicable to its ownership of and dominion and sovereignty over lands covered by the fresh waters of these lakes. At one time the existence of tide waters was deemed essential in determining the admiralty jurisdiction of courts in England. That doctrine is now repudiated in this country as wholly inapplicable to our condition. . . .

"It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and *grants of parcels* which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. . . .

"The control of the State for the purposes of the trust can never be lost, except as to *such parcels* as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of *such parcels* for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language

of the adjudged cases can be reconciled. General language sometimes found in opinions of the courts, expressive of absolute ownership and control by the State of lands under navigable waters, irrespective of any trust as to their use and disposition, must be read and construed with reference to the special facts of the particular cases. A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, *except in the instance of parcels* mentioned for the improvement of the navigation and use of the waters, or when *parcels* can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. . . .

"The trust with which they are held, therefore, is governmental and cannot be alienated, *except in those instances mentioned of parcels* used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining."

If eminent authority be required to support our views, we refer to the decision in the *Illinois Central Case, supra,* which is generally quoted with approval throughout the entire country. It is true that in the Illinois case the grant was to a railroad company, a *quasi*-public corporation, and in that respect, and that only, does it differ from the case at bar. However, it must always be borne in mind that in the present case the grant to the Steel Company was not authorized for the promotion of the interests of a private corporation, but in the interests of a public corporation, in aid of navigation. The private interests are merely incidental to the procurement of the public interests.

*By the Court.*—The judgment of the lower court is affirmed.