271 So.2d 395 (1972)
INTERNATIONAL PAPER COMPANY OF MOSS POINT, Mississippi
v.
MISSISSIPPI STATE HIGHWAY DEPARTMENT.
No. 46635.
Supreme Court of Mississippi.
July 3, 1972.
Rehearing Denied January 2, 1973.
*396 Teller, Biedenharn & Rogers, Vicksburg, Ford, Moore, Jones & Colmer, Pascagoula, Gwin & Gwin, Natchez, for appellant.
A.F. Summer, Atty. Gen., by Delos H. Burks, Deputy Atty. Gen., and Ben H. Walley, Asst. Atty. Gen., Jackson, Karl Wiesenburg, Pascagoula, for appellee.
PATTERSON, Justice:
This is an appeal by International Paper Company from a decree of the Chancery Court of Jackson County which sustained a general demurrer to the appellant's bill of complaint. The complainant sought an injunction against the State from entering upon certain lands located on Lowry Island in Jackson County and to cancel the State's claim of title thereto. We affirm the order of the lower court.
The lands in question are part of a large area located between the east and west branches of the Pascagoula River. In 1817 when Mississippi was admitted to the Union, this area was interspersed with islands and marshes and entirely subject to overflow from high tide of the Gulf of Mexico. Between 1817 and 1884 the elevation of the area increased due to natural accretion and portions of the area were no longer subject to overflow by high tide although on occasion it was inundated by the high waters of the Pascagoula River.
In 1884 the Mississippi Legislature at the insistence of then Governor Lowry, provided, by Chapter 17, Laws of 1884, for the swampland commissioner to have the area, which thereafter became known as Lowry Island, surveyed and sold.
J.M.T. Hamilton was commissioned to conduct this survey and his report indicates that Lowry Island was at that time mostly marsh and tidelands. He reported in part as follows:
... In many places the soil was so boggy that it was impossible to find footing for men and instruments, thus causing a loss of time for offsets and triangulation. Large streams to be crossed frequently, much delay was caused by waiting for the boats to find their way to the line.
All passing to and from work, was necessarily done in boats, following the meanders of the streams from camp to work and returning in the same manner, as it is impossible for a man to walk any considerable distance in one direction without the use of a boat. Men are compelled to proceed slowly and cautiously, if not, at any time they may be floundering in mud to their armpits.
* * * * * *
All of this land is subject to periodical overflow, during freshets in the rivers, only a small portion of which is subject to overflow, from high tide, a greater portion of which lies south of the Louisville and Nashville Railroad.
The provisions of Chapter 17, Laws of 1884, were brought forward and appear in the Code of 1892 as Section 2580 as follows:
Other lands; sale of and price fixed.  All lands fallen or falling to the state *397 by escheat, or coming to it in any other manner; and all accretions of land not the subject of private ownership, and particularly those accretions near the mouth of the Pascagoula river, heretofore surveyed by the state; and all other lands within the borders of the state, and not belonging to the United States nor owned by another, are the property of the state, and are to be managed and disposed of through the land-office; and the land-commissioner may sell any of such lands at the same price as the swamp and overflow lands, subject to be fixed in the same manner and under like regulations. He may, in his discretion, rent out any public land which is improved or tillable, in the same manner and under like conditions as he may rent out improved or tillable tax-land.
The foregoing section was carried forward verbatim as Section 2919, Code of 1906, and now appears as Mississippi Code 1942 Annotated section 4123 (1956).
Subsequent to Hamilton's survey, much of the land called Lowry Island was sold by the State. The State issued patents to the lands involved here to complainant's predecessors in title in 1895, 1897 and 1917, and the titles then passed by mesne conveyances to the complainant. Since 1967 the complainant has had possession of the land and has paid taxes on it as have its predecessors. The area does not lend itself to the normal characteristics of possession inasmuch as it is marsh and swampland. The payment of taxes is the dominant evidentiary element of ownership or possession.
Title to Lowry Island lands has been the subject of dispute for many years. The State of Mississippi, as reflected by several advisory opinions issued through the Attorney General's office, has expressed the belief that title to Lowry Island lands remains vested in the sovereign.
When plans for the development and construction of Interstate 10 became known, the State disclosed its intention to traverse a part of Lowry Island which is claimed by International Paper Company. Thereafter, the highway department entered upon the lands and marked the course across which the highway was to be constructed and the appellant brought this action to cancel the claim of the State of Mississippi and to enjoin the Mississippi State Highway Department from entering upon the property without first securing a right-of-way in conformity with the applicable statutes on eminent domain.
The chancellor below sustained a general demurrer of the State of Mississippi and International Paper has appealed from that decree.
Under the common law both the title and domain of the sea, rivers, and arms of the sea, where the tide ebbs and flows, and of all land below the high water mark, were vested within the King in trust for the public. Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1893). When the American Colonies achieved freedom following the Revolutionary War, "the ownership of, and dominion and sovereignty over, lands covered by tidewaters, and the fresh waters of the Great Lakes, within the limits of the several states, belonged to the respective states within which they were found, with the consequent right to use or dispose of any portion thereof, when that could be done without impairment of the interest of the public in the waters, subject to the right of Congress to control their navigation for the regulation of commerce." [Money v. Wood, 152 Miss. 17, 28, 118 So. 357, 359 (1928)].
In 1817 upon admission of Mississippi to the Union, the State became vested as trustee with "the title to all the land under tide-water, including the spaces between ordinary high and low water marks; this title of the state being held for public purposes, chief among which purposes is that of commerce and navigation, for which latter purposes the title of the state is subservient to such regulations as may be constitutionally made by the national government, in said matters of navigation and commerce." *398 [Rouse v. Saucier's Heirs, 166 Miss. 704, 713, 146 So. 291, 292 (1933)].
The bill of complaint alleges that in 1817 the land in question was subject to the ebb and flow of high and low tides. There would seem to be little doubt that the land masses which thereafter arose through accretion and which was not contiguous to private property, belonged to the State. The bed of a bay is property of the state and all bodies of land arising from or upon such state-owned bay floor become and are property of the state. Where certain tracts are not in existence at the time of the land grant to the state and they are subsequently formed by deposits of silt, soil, etc., from a river, title vests in the state. Giles v. Basore, 154 Tex. 366, 278 S.W.2d 830 (1955). This case, however, does not draw a distinction between emerging contiguous lands and those which are noncontiguous. In Moore v. Kuljis, 207 So.2d 604 (Miss. 1967), this Court held in following the precedents of Harrison County v. Guice, 244 Miss. 95, 140 So.2d 838 (1962); Skrmetta v. Moore, 227 Miss. 119, 86 So.2d 46 (1956); and Skrmetta v. Moore, 202 Miss. 585, 30 So.2d 53 (1947); that property owners adjacent to tidelands were entitled to the accretionary buildup thereto whether it resulted from man-made or natural accretion. We find no authority suggestive of title to noncontiguous emerging tidelands whose characteristics have changed from tidelands to fast dry lands.
In Hogue v. Bourgois, 71 N.W.2d 47, 54 A.L.R.2d 633 (N.D. 1955), the North Dakota Supreme Court indicated that where an island or accumulation of land formed apart from the mainland by deposits of alluvial accretions in the bed of a navigaable stream, but such accumulation or island of land had not become "fast dry land" at the time the State was admitted to the Union, title of such land or accumulation together with all additions thereto formed by the natural causes through the gradual process of accretion vested in the State.
From the bill of complaint we note that the appellant seeks cancellation of the State's claim to all of the lands described therein except the well defined navigable streams. It therefore claims title to the marshlands below mean high tide as well as title to any lands that have emerged by accretion so that they are now fast dry lands. The issue before the Court is whether the legislature had the authority to convey in fee simple the marshlands as well as the accreted land on Lowry Island for private benefit.
The chancellor reasoned that such authority was not present, indicating "that the ownership of the state was and is as trustee for the use and benefit of all of the people of the state and it is not subject to conveyances to private individuals for private purposes." This Court in initially discussing the public trust by which title to tidelands is held by the State, held in Money, supra, that the sovereign could not convey in fee simple the title to submerged trust property to private owners for private purposes. In the case of Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933), we considered the issue of whether the State, and somewhat obliquely the Federal Government, could convey fee simple title to marshlands situated along the Wolf River which flows into the Bay of St. Louis to an individual for private purposes. Justice Griffith, speaking for the Court, stated:
Neither the state nor the federal government can validly convey title in fee simple to an area such as above mentioned to private owners for private purposes. To what extent and what title may be conveyed for public purposes, and particularly for the purposes of commerce and navigation and fisheries, is not here before us, and an academic discussion will therefore not be undertaken upon that subject. (166 Miss. at 713, 146 So. at 292).
To the same effect see Parks v. Simpson, 242 Miss. 894, 137 So.2d 136 (1962); Giles v. City of Biloxi, 237 Miss. 65, 112 So.2d *399 815 (1959); Xidis v. City of Gulfport, 221 Miss. 79, 72 So.2d 153 (1954); Crary v. State Highway Commission, 219 Miss. 284, 68 So.2d 468 (1953); State ex rel. Rice v. Stewart, 184 Miss. 202, 185 So. 247 (1939); and State v. Stewart, 184 Miss. 202, 184 So. 44 (1938). We are of the opinion from these authorities that the chancellor below properly sustained the demurrer to the bill of complaint which challenged the State's title to those lands below the level of mean high tide.
The appellant contends, however, that the most recent pronouncement of this Court upon the subject, Treuting v. Bridge & Park Commission of City of Biloxi, 199 So.2d 627 (Miss. 1967), eroded the rule announced in Money, supra, and the cases following it. In Treuting the principal issue was whether a conveyance by the State of filled-in tidelands was a valid exercise by it of its duty to the citizens of the state as trustee of the tidelands. We stated that the legislature had authority to provide for the sale of lands filled in above the ebb and flow of the tide by spoil derived from shoal waters to private owners when incident "to the overall public interest and purpose in accommodating an expanding population, commerce, tourism and recreation." We observe that this case is an exception to the general rule which prohibits the sale by a trustee to anyone for a private purpose. The case was restricted in its terms to the circumstances there existing which arose from special legislation directed to a particular area. We held this authority of sale valid only because a public purpose resulted which was clearly paramount to the private interest. The case is not authority for nor does it lend validity to the act of the legislature in 1884 which attempted to authorize the sale of the state's trust lands lying between the east and west branches of the Pascagoula River to private persons for private purposes.
Perhaps the more intricate and related question is whether the State was empowered to sell for private purposes at the time it attempted to sell the accreted lands not contiguous to private property that had arisen above mean high tide. While it is true that the character of the land, admitted by demurrer, has changed by accretion from the time it vested in the State until the time of the legislative enactment and that perhaps its paramount use for navigational purposes has diminished, nevertheless it is our opinion that these changing characteristics of the land did not displace the trust imposed upon the State for the public. In Treuting, supra, we noted the continuation of the common law trust in the following language:
Under the particular facts of this case, the chancery court was warranted in concluding that the state could convey to the Park Commission fee simple title to the submerged lands in question, for public purposes and uses in the overall development of Deer Island. Moreover, the legislature was justified in authorizing sale of these lands, when filled in and developed, to private individuals as an incident to the overall public interest and purpose in accommodating an expanding population, commerce, tourism and recreation. There will be no substantial interference with the original purposes of the trust imposed upon the state in connection with these submerged lands, and the development as authorized by the statutes is consistent with the public trust.... (199 So.2d at 633).
The authorized development was held to be consistent with the public trust and in the public interest. Here the claim of title by the appellant is directed to a private interest, a distinction from Treuting of such significance that it does not control the present case involving a paramount private interest. We conclude that the decree of the lower court sustaining the demurrer should be affirmed.
The appellant next contends that the assessment and collection of taxes on these lands by the State for a period in excess of half a century, together with its failure to file suit to set aside the patent, should in *400 equity estop the State from contending its patents to be invalid. It cites in support of this position the recent case of State v. Stockett, 249 So.2d 388 (Miss. 1971). We are of the opinion this argument is not well founded since the facts in Stockett, supra, were substantially different from the admitted allegations of the present bill of complaint. We are of the opinion that this contention is unavailing and that the decision of the lower court should be affirmed.
Affirmed.
GILLESPIE, C.J., and SMITH, ROBERTSON and SUGG, JJ., concur.

ON PETITION FOR REHEARING
Rehearing denied.
SMITH, Justice (dissenting):
I must, with great deference, dissent from the action of the majority in denying the petition for rehearing. I have reached the conclusion that rehearing should have been granted.
It should be declared by this Court that no common law rule, including the one dealt with in the majority opinion, not embodied in a constitutional provision, can survive or withstand a legislative enactment specifically dealing with the subject matter and providing a contrary rule. At the least, it seems to me, if the Court should be unwilling to prefer the statute to the common law rule, the lower court should be reversed, the demurrer overruled and the case remanded for trial upon the merits for the purpose of determining what part, if any, of the patented lands in fact lie above mean high water (not within the ebb and flow of the tide) so as not to be subject to the rule.
The decision of the majority is an echo of an age long past. The so-called "rule" of the common law relied upon for the result came into being in the days of the absolute personal rule of Kings. In 1938 in State ex rel. Rice v. Stewart, 184 Miss. 202, 184 So. 44, 49, the Court quoted from Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1893) as follows:
... [U]nder the common law, the title of land beneath the rivers and arms of the sea, where the tide ebbs and flows, belonged, jus privatum, to the King as the sovereign; and that the dominion thereof jus publicum, was vested in him as the representative of the nation and for the public benefit.
In State v. Stewart, supra, this Court also stated:
[W]e hold the State of Mississippi to be the absolute owner of the title of the soil, and of the minerals therein contained, in the beds of all of its shores, arms and inlets of the sea, wherever the tide ebbs and flows, as trustee for the people of the State, and subject only to the paramount right of the United States to control commerce and navigation, with the consequent right to use or dispose of any portion thereof, when that can be done without impairment of the interest of the public in the waters, subject to the paramount right above mentioned, and not inconsistent with Section 81 of our state constitution. (Emphasis added.)
This case in no way involves the obstruction of any navigable stream, or interference with navigation or fisheries. In no way does it involve any "impairment of the interest of the public in the waters."
It is to be borne in mind that the amended bill was dismissed on general demurrer. The complainant deraigned its title from patents granted by the State of Mississippi to private purchasers, executed pursuant to statutes duly enacted by the Legislature by the State's authorized officers. The State patents in this case were executed, respectively, in the years 1894, 1895, 1897, and 1917. Afterward, and prior to the conveyance of the property to the present complainant, the land was bought, sold, paid for and conveyed in all good faith by various private owners (unless the State's *401 solemn patent conveyed no title) and title finally became vested in the complainant by purchase and conveyance. Throughout the more than three-quarters of a century which elapsed following the date of the grant of the earliest of the patents, the land has been given for taxation, has been duly assessed and taxes paid thereon and has been dealt with in every respect as privately owned.
It is now asserted by the State in this suit that, since it desires to use a part of the land, it has never parted with its title to any of it, because, it is said, it could not do so under the "common law" rule. It follows, therefore, that the common law is to be considered perpetual and paramount and to supersede and nullify statutory enactments of the Mississippi Legislature dealing with the subject lands.
The bill asserts that there is a substantial part of the land embraced within the boundaries of the land described in the patents which lies above mean high tide. It also expressly negatives the proposition that its ownership or use interferes with or impedes commerce, navigation or fishing. Actually, as has been said, these are areas preempted by the United States and Federal regulations control.
Some public right may exist in those parts of the lands over which it may be established that the tide ebbs and flows, which a private owner may not lawfully abridge or impair. For instance, obstruction of a navigable stream would be unlawful. Do such facts, however, if they exist, render void title to all portions of the land bought and held in good faith by a succession of owners over a period of many years? The consequences of such a rule are incapable of being known, measured or foreseen.
The context in which the rule first saw the light of day was wholly dissimilar and in no way comparable to present circumstances now existing in Mississippi. Then the King ruled, it was said, by Divine Right. He exercised what was known as his Royal Prerogative. He might grant lands or take them away at his pleasure. Wars were fought and won or lost before any restriction or limitation upon the exercise of the Royal Prerogative could be imposed. The "people", as we understand that term in the present context, were not represented in those days, even in Parliament, since the franchise was narrowly restricted. The "commonality" had no voice by means of which they could make themselves heard. In fact, in England it was not until the adoption of the Reform Act of 1867 that there was a semblance of universal suffrage by general enfranchisement of the male population.
Under the form of government which exists in this country, the people act and speak through their freely chosen representatives in Congress and in State Legislatures. In the enactment of law these bodies, at least theoretically, are limited only by the provisions of the Federal and State Constitutions. It has been truly said that while courts serve the people, the members of Congress and of Legislatures represent them.
The rule relied upon by the majority as denying the Legislature the power to authorize disposal of these lands has no recognizable sanction in either the State or Federal Constitution. It is incredible, it seems to me, that in Mississippi in modern times a common law rule has been declared to be controlling and to nullify an express statute enacted by the Legislature. As a matter of fact, this Court in Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627 (Miss. 1967) approved the action of the Legislature in authorizing the disposition of lands said to fall within the category embraced within the rule. It was said in that case that the private uses contemplated were merely incidental to a paramount public purpose but were nevertheless essential thereto. This Court in Treuting approved the action of the Legislature in authoring disposition of lands said to fall within the category embraced by the rule, even though such action would *402 result in private ownership, because, it was said, this would serve public purposes of tourism and recreation.
It could be argued with equal logic, it seems to me, that the obtaining of money for public use through the sale of lands such as these could be considered a "public purpose" as well as putting such lands on the tax roles and allowing them to be employed and developed as contributing to the general public economy of the State.
While this statement as to Treuting may be an over simplification of that case, the case does serve to indicate to me that the "rule" has not been considered by this Court to be an unsurmountable obstacle to the conveyance of lands of the type referred to such as would have been the case if grants of that character had been constitutionally prohibited.
The voice of the Legislature is the voice of the people. The Legislature having spoken in this area, the common law rule no longer exists insofar as it conflicts with the statute.
I cannot agree that it is within the prerogative of the judiciary to set at naught a plain statute which conflicts with no constitutional provision (as we have seen in Treuting, supra) on the basis of a contrary common law rule devised centuries ago to curb the actions of the absolute monarch. The repose of land titles is and has long been a major and fundamental objective of the law. Statutes of limitation and the doctrine of equitable estoppel have been devised and enforced to circumvent the successful assertion, after long periods of time, of supposed claims of title to land.
In Warren County v. Lamkin, 93 Miss. 123, 161, 46 So. 497, 511 (1908) we find the following statement:
It is apparent on casual examination that, if between private persons, recovery in this case would be impossible. But a slice of sovereignty in the shape of a county as plaintiff erects itself here, and, while there can be no criticism of the authorities in trying to recover what may be legally public property, still courts will be disposed, if they can, to apply the same rules that the law applies as between the humblest and most unpretentious private citizens. This is incumbent on us, and exceptions in favor of sovereignty in matters of property on the application of the statute of limitations must have, of course, strict construction as against the sovereignty.
In Reliance Manufacturing Company v. Barr, 245 Miss. 86, 99, 146 So.2d 569, 574 (1962) the general rule is set out:
The authorities hold generally, however, that the defense of equitable estoppel may apply to a state "in a proper case." Courts have not attempted to define what is meant by the phrase "in a proper case", and it has been pointed out that it is better that each case be controlled by its own facts. 31 C.J.S. Estoppel [§ 140, p. 411], supra.
Notwithstanding the "common law rule," the assertion of title, more than three-quarters of a century after the execution and delivery by the State of its solemn patent, in my view, requires the interposition against it of the doctrine of equitable estoppel. If ever there was or is to be a "proper case" in which the defense of equitable estoppel is to prevail against the State, this case is that one.