THE WEST INDIAN COMPANY, LIMITED, Plaintiff

v.

GOVERNMENT OF THE VIRGIN ISLANDS, Defendant

and

THE LEGISLATURE OF THE VIRGIN ISLANDS,
Intervenor

and

Helen W. Gjessing, Individually and as President of Save Long
Bay Coalition, Inc.; Leonard Reed, Individually and as
President of Virgin Islands Conservation Society, Inc.; Kate
Stull, Individually and as President of League of Women
Voters of the V.I., Inc.; Lucien Moolenaar, Individually and as
President of Virgin Islands 2000, Inc.; Ruth Moolenaar,
Individually and as Director of the St. Thomas Historical Trust,
Inc., Intervenors

Civil No. 1986/293

District Court of the Virgin Islands

Div. of St. Thomas and St. John

September 3, 1986

MARIA T. HODGE, ESQ. (Argued), St. Thomas, V.I., and SANFORD C. MILLER, ESQ., New York, N.Y., *for The West Indian Company, Limited*

RHYS S. HODGE, ESQ. (Argued), St. Thomas, V.I., *for Legislature of the Virgin Islands*

*Attorneys for Intervenor Gjessing, et al.*

ALEXANDER A. FARRELLY, ESQ. (BIRCH, DEJONGH & FARRELLY), St. Thomas, V.I.

DAVID A. BORNN, ESQ., St. Thomas, V.I.

EDITH L. BORNN, ESQ., St. Thomas, V.I.

JUDITH L. BOURNE, ESQ., St. Thomas, V.I.

BENJAMIN A. CURRENCE, ESQ. (PALLME & MITCHELL), St. Thomas, V.I.

VERONICA J. HANDY, ESQ., St. Thomas, V.I.

STEDMANN HODGE, ESQ., St. Thomas, V.I.

BRENDA HOLLAR, ESQ. (Argued), St. Thomas, V.I.

AURELIA RASHID, ESQ. (Argued) (BIRCH, DEJONGH & FARRELLY), St. Thomas, V.I.

DENISE REOVAN, ESQ. (LAW OFFICES OF DESMOND MAYNARD), St. Thomas, V.I.

HIRAM ABIFF RASOOL, Amicus Cúriae c/o Jackson Insurance Agency, St. Thomas, V.I.

O'BRIEN, *Judge*

## MEMORANDUM OPINION AND ORDER

For 73 years The West Indian Company, Limited, has had rights of reclamation in the principal harbor of St. Thomas. These rights were preserved in the 1917 treaty between Denmark and the United States whereby the Virgin Islands became a United States possession. They have been conceded and accepted by every territorial elected governor, their attorneys general, and two separately elected territorial legislatures. The issue before us is whether these rights, now contained in a contract to which the territorial government is a party, may be extinguished by the presently sitting legislature pursuant to its reserved power.

We find that they may not, and we will enter a preliminary injunction to enjoin interference with the rights contained in the original contract and its addenda.

## I. FACTS

This controversy has its genesis in a 1913 grant by the Government of Denmark to the plaintiff herein ("WICO") of substantial rights to reclaim and fill designated portions of Charlotte Amalie harbor, St. Thomas. These rights were specifically preserved in the 1917 treaty between the United States and Denmark which ceded the Virgin Islands to the United States. The Treaty provides at Section 3:

362

4) The United States will maintain the following grants, concessions and licenses, given by the Danish Government, in accordance with the terms on which they are given:

 a. The concession granted to "Det Westindiske Kompagni" (The West Indian Company) Ltd. by the communications from the Ministry of Finance of January 18th 1913 and of April 16th 1913 relative to a license to embank, drain, deepen and utilize certain areas in St. Thomas Harbor, and preferential rights as to commercial, industrial or shipping establishments in the said Harbor.

The question whether the grant to WICO was in perpetuity or whether it had a termination point, was cleared up in advance of the treaty by communications from the Government of Denmark to the United States in response to the latter's inquiry. Denmark made clear that the grant to WICO was in perpetuity, without limitation as to the time within which the license was to be exercised.

Notwithstanding the exchange of communications which indicated that the grant to WICO was without a time limitation, the United States initiated a civil action in District Court, Division of St. Thomas, in 1968. (Civ. No. 1968/337.) In it, the Justice Department sought to have the District Court declare WICO's rights terminated. While the case was pending, the Danish Government sent a diplomatic note dated June 17, 1970, to the Government of the United States, requesting it to respect the WICO concession.

Thereafter, the Hon. Warren H. Young, U.S. District Judge, assigned to the case, noted the obvious difficulty the United States would have in terminating WICO's rights in the face of its knowledge, prior to the Treaty, that they were without time limitations. He also viewed the involvement of the Government of the Virgin Islands, not then a party to the case, as a prime necessity in order to protect its own vital interests. The result of Judge Young's concerns was a letter to Governor Melvin H. Evans, the territory's first elected governor, urging him to become personally involved in a settlement of the case.

Settlement negotiations involving the United States, the territorial government, WICO and other parties to the lawsuit resulted in a settlement proposal by WICO which found favor with the territorial government. Public hearings were held on the matter and the settlement was referred to the Legislature of the Virgin

Islands for ratification and approval. On October 11, 1972, the Legislature approved Act No. 3326, and the Governor formally affixed his approval to this legislation on October 30, 1972.

The formal Memorandum of Understanding (hereafter "Memorandum") dated nearly a year later, October 3, 1973, was signed by representatives of the United States, the Virgin Islands, and WICO, among others. One of the most significant aspects of the Memorandum is that the acreage of the concession granted WICO was measurably reduced and the territorial government received rights to other lands it did not previously possess. These are only two of the major provisions of the 35-page Memorandum.

There is no question that the Memorandum was a full settlement of the litigation initiated by the United States in 1968, since both the Memorandum and Act No. 3326 ratifying and approving the settlement speak to that point. It is also important to note that the Attorney General of the Virgin Islands was required to approve the Memorandum (and subsequent Addenda) relative to the authority of the territorial officials to enter into such agreement, and to determine that the documents were legal, binding and valid.

The Memorandum contains an elaborate procedure for transfer of the submerged lands to WICO once both parties, the Virgin Islands Government and WICO, fulfilled certain preconditions. To date many of these conditions remain unfulfilled awaiting completion of the dredging and filling. One nuance of these procedures which needs explanation is the transfer of the lands from the United States.

In the Memorandum, the Justice Department took the view that the settlement proposal encompassed important matters outside the scope of the lawsuit and therefore required any disposition of property to be made under the then existing Territorial Submerged Lands Act. 48 U.S.C. § 1701 et seq. (Supp. 1986) (see pg. 7 of the Memorandum). At that time the United States held title to all submerged lands surrounding the Virgin Islands, subject, of course, to WICO's rights preserved in the Treaty. The Memorandum, to recognize the United States' claim to these lands, included a two-step conveyance procedure ("transfer procedure") to occur at closing. First, the land was to be conveyed from the Secretary of the Interior to the Virgin Islands Government and only then reconveyed to WICO. (See § 6(a) of Memorandum at pg. 14.) This procedure became moot as of October 5, 1974, because control of these submerged lands was transferred from the United States to

the Government of the Virgin Islands, subject to valid existing rights. 48 U.S.C. § 1704 et seq. (Supp. 1986).

A First Addendum to the Memorandum of Understanding was entered into on October 28, 1975, to reflect this transfer of control to the territorial government over submerged lands. A $45,000 annual payment, previously made to the U.S. Department of Interior by WICO, was from that time to go to the territorial government. The attorney general determined that the First Addendum need not be submitted to the Legislature. In effect this addendum recognized there was no longer a need for the two-step conveyance since the United States no longer held title to the land. At this point in time the only thing preventing transfer of title pursuant to the Memorandum was completion of the various recognized preconditions mentioned above.

Thereafter, the Virgin Islands enacted in 1977 the Coastal Zone Management Act. 12 V.I.C. §§ 901-914 (1982). To reflect a compromise concerning the application of the Act to WICO's previously existing concession rights, the Government, WICO, and certain private parties entered into a Second Addendum to Memorandum of Agreement, dated September 22, 1981. That agreement further limited WICO's rights of reclamation which, by virtue of the various agreements, were reduced from 42 acres to 15 acres. A requirement of the Second Addendum was that it be ratified and approved by the Legislature, which took place on April 7, 1982, as Act No. 4700.

On April 12, 1984, in a yearly review of the status of cases, this Court entered a dismissal of the 1968 action by the United States against WICO for lack of prosecution.

In June 1986, WICO commenced its dredging in the Long Bay area of St. Thomas, having obtained the necessary permits. This dredging is one of the preconditions required of WICO in the Memorandum. The ensuing publicity generated energetic citizen response, which in turn generated a bill in the Legislature to repeal WICO's rights contained in Act Nos. 3326 and 4700. This bill (16-0607) was a repudiation not only of the prior legislative ratifications of Act Nos. 3326 and 4700, but a disavowal of the territorial government's prior approval of the Memorandum of Understanding, the First Addendum and the Second Addendum. Bill No. 16-0607 was approved by the Legislature on July 9, 1986, but vetoed by Governor Juan Luis on July 21, 1986. On August 11, 1986, the

Legislature overrode the veto by the Governor and it became law as Act No. 5188.

On August 14, 1986, WICO promptly moved in this Court for a temporary restraining order and a preliminary injunction against enforcement of the provisions of Act No. 5188, and other relief. On August 19, 1986, a hearing was held pursuant to this motion. At that time we enjoined by temporary restraining order, any interference with WICO's right to dredge and scheduled a hearing on the preliminary injunction for August 26, 1986.

At the August 19, 1986, hearing on a temporary restraining order, the attorney general of the Virgin Islands informed the Court that the executive branch of the government would not appear in the case, since it considered the repeal of WICO's rights to be invalid, and any appearance on its part would be simply to affirm WICO's right to the relief sought.

We then permitted the Legislature of the Virgin Islands to appear as an intervenor, along with certain officers of interested citizen groups. We rejected a motion by the intervenors to compel the executive branch to appear in the case. We noted at the time that with the grant of intervention to both the Legislature and the citizen group representatives, the interests of those favoring repeal of WICO's rights would be well represented, even without the appearance of the executive branch. This view was rewarded by the swift filing of briefs by intervenors, and by the excellence of the briefs and the oral presentations by intervenors' counsel.

To summarize, as of August 1986, three successive elected governors, their respective attorneys general, and two separate Legislatures of the Virgin Islands have recognized WICO's right to dredge and reclaim certain defined submerged lands in the harbor of Charlotte Amalie. The various officials described above successfully negotiated limits with respect to both acreage and time as to WICO's rights, and gained important concessions in favor of the territory. The reason for this case is that the Sixteenth Legislature, now sitting, takes issue with the validity of the actions undertaken by the territorial officials above described.

## II. DISCUSSION

The elements a moving party must show for a preliminary injunction are: "a reasonable probability of eventual success in the litigation and that the movant will be irreparably injured pendente

lite if relief is not granted." Professional Plan Examiners of N.J. v. Lefante, 750 F.2d 282, 288 (3d Cir. 1984).

 In addition to the above elements, a District Court should consider two other elements when relevant. These elements are the possibility of harm to other interested persons from the grant or denial of the injunction, and the public interest. Professional Plan Examiners, supra at 288. Examining these four elements, we find WICO has convincingly satisfied all four requisite elements.

A. *Reasonable Probability of Success*

WICO's strongest argument is that the Repeal Act violates the contract clause of the United States Constitution, Article I, Section 10 as contained in Section 3 of the Revised Organic Act of 1954.

The intervenors respond by challenging WICO's contract clause argument in two ways. First, they assert the transfer procedure in the 1973 Memorandum Agreement created additional conditions precedent necessary for WICO's rights, under the 1973 agreement, to mature. They refer to the federal conveyancing discussed earlier and since these procedures were never followed, argue WICO lost its right to the land. Second, they claim the Repeal Act is a valid use of the Virgin Islands police power—a power which cannot be limited by contract. We take these arguments in sequence.

1) *WICO's Right to Submerged Land*

In tracing WICO's rights, we find these rights originated in the Danish grants of 1913 and were recognized and affirmed in the 1917 treaty between the United States and Denmark. In this treaty both countries intended to preserve WICO's right, in perpetuity, to obtain these submerged lands.[1]

The settlement to the 1968 litigation further defined WICO's rights to the submerged property. The Memorandum established specific conditions both the Virgin Islands and WICO were required to complete prior to closing on the land. Additionally, the

---

[1] At oral argument, the attorney for the citizen intervenors stated that the "license" granted WICO in 1913 did not amount to a "fee simple" interest. The 1913 grant, however, states that ". . . when these land areas are reclaimed, the company will acquire free and unrestricted ownership thereof . . . ." This certainly does provide for what we term "fee simple" ownership. In any event, it is clear that the Memorandum of Understanding and the addenda thereto were intended to provide fee simple ownership to WICO of the described lands. Finally, we note that even the complaint filed by the United States in Civ. No. 1968/337 recognized that the license granted WICO provided ". . . free and unrestricted exercise of property rights . . . ."

transfer procedures were established to pass title from the United States through the Virgin Islands to WICO. These procedures state in relevant part:

## 6 CONVEYANCES

(a) *General.* If the requirements of the Territorial Submerged Lands Act are met, the Secretary of the Interior shall convey to the Government of the Virgin Islands, and the Government of the Virgin Islands shall convey the Filled Lands and Submerged Lands hereinafter described (and the right to reclaim the same) in Long Bay, St. Thomas Harbor, in part to WICO and in part to the Byers group.

The intervenors interpret these transfer procedures, and subsequent amendments to the Submerged Lands Act, in an unusual way. They assert these transfer procedures created additional conditions necessary for WICO's claim to mature. Unlike the recognized preconditions, such as filling and dredging, they argue the transfer procedure had to be fulfilled prior to the 1974 amendments to the Submerged Lands Act. The reason for this concerns the title the Virgin Islands received in 1974.

The intervenors reason that prior to 1974, the United States held title to all submerged lands around the Virgin Islands, subject as we said, to WICO's rights. After the amendments to the Submerged Lands Act in 1974, title to these lands reverted to the Government of the Virgin Islands to be held in trust for the people of the Virgin Islands albeit still subject to WICO's rights.[2] Up to this point WICO had not received title to these lands since both the recognized preconditions of the Memorandum Agreement, and the claimed preconditions from the transfer procedure, remained unfulfilled. At this point, however, intervenors argue that the Virgin Islands no longer had the ability to transfer title to WICO since it never held

---

[2] The Submerged Lands Act states in relevant part:

> Subject to valid existing rights, all right, title, and interest of the United States in lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coastlines of the territories of Guam, the Virgin Islands, and American Samoa, as heretofore or hereafter modified by accretion, erosion, and reliction, and in artificially made, filled in, or reclaimed lands which were formerly permanently or periodically covered by tidal waters, are hereby conveyed to the governments of Guam, the Virgin Islands, and American Samoa, as the case may be, to be administered in trust for the benefit of the people thereof.

48 U.S.C. § 1705(a) (Supp. 1986).

these lands in fee simple but as trustee for the people of the Virgin Islands. Since the Virgin Islands did not have title it could convey, any subsequent agreement to convey title was ineffective. We disagree with this analysis.

■ First, we disagree with the intervenors' characterization of section 6(a) of the Memorandum Agreement. This section does not create additional preconditions. On the contrary, it merely establishes ministerial acts which had to be performed in order to properly convey title.

■ Second, since the transfer procedures are not preconditions but ministerial acts, we also disagree with intervenors' legal interpretation of the relationship between 1974 amendments to the Submerged Lands Act and the 1973 Memorandum. Contrary to the intervenors' assessment, this relationship does not, through an unforeseen series of events, create a situation which prevents WICO from ever receiving title to these lands. Rather, this relationship simply makes moot the transfer procedures. Once the recognized preconditions are satisfied, WICO will no longer seek title through the Virgin Islands from the United States but will simply receive title direct from the Virgin Islands. In effect, the transfer of title from the United States to the Virgin Islands eliminated the need for portions of section 6(a) of the Memorandum Agreement.

Evidence for this position is contained in the First Addendum to the 1973 Memorandum Agreement. The changes made in the First Addendum to the 1973 agreement are cosmetic and required only so the 1973 Memorandum Agreement comports with the Submerged Lands Act.

■ Third, and of significant import, the Submerged Lands Act makes its transfer in trust "[s]ubject to valid existing rights." 48 U.S.C. § 1705(a) (Supp. 1986). WICO's rights were therefore preserved and recognized in this act, notwithstanding the fiduciary nature of the transfer.

Finally, we take issue with what we perceive are the two ways the intervenors seek to assert the public trust doctrine.[3] First, they claim prior elected officials did not have the authority to enter into any agreement which relinquished title to these lands, because these lands are held in trust and may never be conveyed. WICO, therefore, allegedly has no right to the property in question. Second, they seem to allege that the public trust doctrine may be cited as a legitimate public purpose for supporting the Repeal Act, to defeat WICO's Contract Clause claim. We feel compelled to address these contentions, if only because they were pressed with such force and vehemence. We note too that the same contentions permeated the legislative debate on repeal of WICO's rights.

a) *Public Trust Doctrine*

■ Land under tide waters has a special legal character. State of Cal., etc. v. United States, 512 F. Supp. 36, 40 (N.D. Cal. 1981). This special character was described by the Supreme Court in Illinois Central R. Co. v. People of the State of Illinois, 146 U.S. 387 (1892) as:

> a title different in character from that which the State holds in lands intended for sale. It is different from the title which the United States holds in public lands which are open to preemption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.

Illinois Central, supra 146 U.S. at 452.

[3] In the transfer of submerged lands from the United States to the Virgin Islands, the statute states this land will be "administered in trust for the benefit of the people thereof." 48 U.S.C. § 1705(a) (Supp. 1986). An additional source for this authority is derived from the power the Virgin Islands Government has as sovereign over these islands. J. Sax, "The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention" 68 Mich. L. Rev. 471 (1970). For the early history of this doctrine in America see Shively v. Bowlby, 152 U.S. 1 (1894).

The principle described in Illinois Central has come to be known as the public trust doctrine.[4]

■ In general, the public trust doctrine recognizes that some types of natural resources are held in trust by a government for the benefit of the public. W. Rogers Jr., Environmental Law, supra at 171 n.8. Historically the doctrine applied to lands below the low-water mark in the sea and great lakes, the waters over these lands, and the waters within navigable rivers and streams. Sax, "The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention," 68 Mich. L. Rev. 471 (1970). We recognize that cases exist which support the intervenors' proposition that in general the trustee to trust lands is prohibited from selling these areas to anyone for a private purpose. International Paper Co. v. Mississippi St. Hwy. Dept., 271 So. 2d 395, 399 (Miss. 1972), cert. denied, 414 U.S. 827 (1973). This prohibition however, is not absolute.

b) *Situations Where Courts Recognize a Private Party's Title to Trust Lands*

In a number of situations courts have either upheld conveyances of trust lands to private interests, free of the trust, or have recognized title in a private party to trust lands. The following situations are pertinent to the case at bar.

■ *Improvement of Navigation or When Public Trust Is Not Impaired*

■ Submerged lands can be conveyed to the use and control of private parties for the improvement of the navigation and use of the waters or when the parcels can be disposed of without impairment of the public interest in what remains. Appleby v. New York, 271 U.S. 364, 394 (1926) (Supreme Court recognized title, free of the trust, in private persons to filled trust lands); Illinois Central R. Co., supra at 453. At least one state has held that in the proper administration of the trust, they may find it necessary

---

[4] Prior to describing the parameters of this doctrine, we note one authority has commented that:

Any attempt at a shorthand statement of the principles of public trust must come with a disclaimer: the constitutional and legislative variations among the states approach the infinite, and many states fulfill some of the identical policy functions under different doctrinal rubrics—prescriptive rights, customs, dedication or other property theory.

W. Rogers Jr., Environmental Law, § 2.16 (1977). We agree with this assessment concerning the law of public trusts and concur in this disclaimer.

to cut off certain tidelands from water access and render them useless for trust purposes. In these cases the State Legislature has the power to make this determination and free the lands from the trust. When such lands have been so freed, they may be irrevocably conveyed into absolute private ownership. City of Long Beach v. Mansell, 476 P.2d 423, 437-38 (Cal. 1970) (in bank) (describing common law trust doctrine as opposed to the California Constitutional prohibitions against alienation of these lands).[5]

### ■ Settlement of Land Disputes

■ The second instance involves settlement of land disputes. When title and boundaries to certain submerged and reclaimed trust lands are in dispute, a settlement between the local government and landowners will be enforced and will not be set aside based on an assertion that the settlement violates the public trust doctrine. City of Long Beach, supra. Groups not party to the original settlement will also be prevented from raising the doctrine to challenge titles granted pursuant to the settlement. Amigos De Bolsa Chica v. Signal Properties, 190 Cal. Rptr. 798 (Cal. Ct. App. 1983).

### ■ International Duty

■ Governments may recognize title in private individuals to trust property pursuant to an international duty, even though the original alienation of submerged lands may conflict with the public use doctrine. Summa Corp. v. California ex rel. State Lands Comm'n, 466 U.S. 198, 206-207 n.4, reh'g den., 467 U.S. 1231 (1984); Montana v. United States, 450 U.S. 544, 552, reh'g den., 452 U.S. 911 (1981).

The facts in Summa, supra, are remarkably similar to those before us. The petitioners' title to the land in question dated back to 1839 when the Mexican Governor of California granted title to the property to the petitioners' successors in interest. This property became part of the United States following the war between the United States and Mexico which was formally ended by the Treaty of Guadalupe Hidalgo in 1848. Under the terms of this treaty the United States undertook to protect the property rights of Mexican landowners. To both fulfill its obligations under the treaty and to provide for an orderly settlement of land claims, Congress passed

---

[5] For examples of other states which include versions of the public trust doctrine in their respective constitutions see the state constitutions of Pennsylvania and Wisconsin.

the Act of March 3, 1851, setting up a comprehensive claims settlement procedure.

The successors in interest followed the procedures provided in the Act and eventually the Secretary of Interior approved their claim and issued them a patent confirming their title. The Supreme Court noted as significant the fact that no mention of any public trust was made in the patent and that California did not assert this interest during the confirmation hearings.

The precise issue before the Court was whether

a property interest [public trust easement] so substantially in derogation of the fee interest patented to petitioner's predecessors can survive the patent proceedings conducted pursuant to the statute implementing the Treaty of Guadalupe Hidalgo.

Summa, supra at 205.

In holding it could not, the Court stated:

Patents confirmed under the authority of the 1851 Act were issued pursuant to the authority reserved to the United States to enable it to discharge its international duty with respect to land which, although tideland, had not passed to the State.

Summa, supra at 205.

 As we hope is by now obvious, the Supreme Court has approved recognition, by a government, of title in private hands to trust lands. WICO's original rights, like the original grants in Summa, occurred under the auspices of a foreign government and were subsequently recognized in a treaty with the United States. Both treaties predated that point in time when California and the Virgin Islands had control over the respective tidelands. The grants, therefore, occurred prior to the existence of the public trust doctrine. Pursuant to the international agreements, they should be upheld in the face of a challenge based on this doctrine.

The challenge to the 1973 settlement, like the challenges to the settlements in City of Long Beach, supra, and Amigos, supra, must also be rejected. As in those cases, in 1973 the United States, the Virgin Islands, and WICO were in contention over the extent and validity of WICO's right to reclaim 42 acres of land. The compromise at that time benefited both sides because it clearly acknowledged and defined WICO's rights to reduced portions of the submerged land. It is impermissible for the Sixteenth Legislature to extinguish WICO's rights under the settlement, arguing that prior public officials had no such authority to act. As we have seen,

the highest court in the land has found similar acts reasonable and allowable.

█ Finally, we find that there is no impairment of the public trust in the reclamation and development such as proposed by WICO. See, e.g., Appleby, supra. In an analogous case, City of Milwaukee v. State, 214 N.W. 820 (Wis. 1927), the Wisconsin Supreme Court citing to Illinois Central, supra, reiterated the proposition that title to submerged lands could be conveyed to private interests for reclamation when the lands could be disposed of without detriment to the public interest in the lands and waters remaining. City of Milwaukee, supra at 832.

The Wisconsin Legislature granted submerged lands in Milwaukee's harbor to a steel company. The steel company intended to fill these submerged lands and construct docks and wharfs thereby creating employment and economic development.[6] The issue before the Wisconsin court was whether the State of Wisconsin, as a sovereign state of the Union, had the power to cede to Milwaukee, which in turn conveyed to the steel company, property held in trust free of the trust. City of Milwaukee, supra at 821. In holding that Wisconsin could do so, the court made a number of points relevant to WICO's situation.

Initially, the court recognized that normally these lands could not be conveyed to a private person. Id. at 830. The court then reviewed a number of circumstances in which such conveyances are permitted. First, these lands would not damage any rights of other riparian owners or the public. Id. at 829. Second, the court deferred to the Legislative enactment and "presumed the Legislature had made an investigation of the entire situation" and concluded that other riparian owners or the public would not be harmed but, on the contrary, would benefit from the grant. Id. at 829. Third, the court reconciled the conveyance by stating it did not violate the public trust doctrine but actually promoted it. Id. at 830.[7] Finally, the court noted that the steel company, though "a private corporation operated for profit, . . . nevertheless is an important factor in the industrial life of the city and state." Id. at 830. All of these factors are relevant to our case.

---

[6] In the record before us, WICO plans to construct docks off its reclaimed lands for a marina, among other uses.

[7] The Wisconsin Court implied that if the Legislature had not allowed the conveyance, this failure would have amounted to "gross negligence and a misconception of [the Legislature's] proper duties and obligations". Id. at 830.

The 7.5 acres to be reclaimed by WICO fronts land not used for marine purposes but as a housing project and park. The owners of this land are not utilizing their riparian rights in any way. There is no public beach or other particular form of public access—the original waterfront is simply unused shoreline.

The Virgin Islands Legislature, in Act No. 3326, had before it exhaustive studies of the issue and determined the present compromise was in the best interest of the Virgin Islands people. The intervenors consistently ignore how the 1973 compromise with WICO was in furtherance of the public interest. This is described in the Memorandum, to which Governor Evans affixed his signature and the seal of his office, the provisions of which the legislature sitting at the time ratified. We do well to recall the provisions.

For the people of the Virgin Islands, the conveyances to be made "satisfy a compelling public need" in the following respects:

(1) An additional 2 1/2 acres will be added by WICO to the public recreation area near Pearson Garden, thus doubling its size;

(2) Filled land for the waterfront highway to permit widening from two to four lanes will be provided by WICO.

(3) Dredging the harbor in Long Bay will be provided by WICO, thereby benefiting navigation and promoting tourism;

(4) The reclamation will enlarge the area of level land for development near the downtown area of Charlotte Amalie now limited because of the hilly terrain;

(5) The development contemplated on the reclaimed lands for marinas, cruise ship berths, offices and other like facilities will provide additional employment for residents of St. Thomas and enhance tourism facilities;

(6) Termination of the remaining WICO rights under the Danish grant will eliminate a possible cloud over the future of St. Thomas harbor, enabling St. Thomas harbor to be developed on a limited, planned basis, subject to specific time limits.

Memorandum at pp. 7-8.

We find, accordingly, that there is ample precedent and authority for the actions taken by territorial officials in entering into the Memorandum and subsequent addenda, even under the public trust doctrine. For that further reason, WICO's rights should not be impaired.

2) *Police Power v. Contract Clause*

The parties, by asserting the Contract Clause and state police power for support of their respective positions, have placed a constitutional dilemma squarely before us. This dilemma involves the tension between constitutional protections offered to contracts, and the sovereign power to protect the health and welfare of the people.[8] This tension involves, on the one hand, a sovereign's unfettered power to protect the welfare of its people encountering the constitutional protections against state action found in the impairment clause. When a sovereign's action, which impairs contract rights, is allegedly motivated by a legitimate public purpose, this tension comes to a head.

 Without question, it is settled law that states may pass statutes for the promotion of the commonwealth or for the good of the public, though they may impair the obligation of contracts. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241, reh'g den., 439 U.S. 886 (1978). This reserved power "is an exercise of the sovereign right of a Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contract between individuals." Allied, supra at 241 citing Manigualt v. Springs, 199 U.S. 473, 480 (1905).

 Juxtaposed against this sovereign power is the Contract Clause which unequivocally states:

---

[8] Police powers generally are those powers of sovereignty not given to the Federal Government exclusively by the United States Constitution, nor prohibited by that document to the states, nor reserved to the people. 2 C. Antieau, Modern Constitutional Law, § 10:1 (1969). The Supreme Court has described this power in Parker v. Brown, 317 U.S. 341, 359-60 (1943) as follows:

The governments of the states are sovereign within their territory save only as they are subject to the prohibitions of the Constitution or as their action in measure conflicts with powers delegated to the National Government, or with Congressional legislation enacted in the exercise of those powers.

Congress included police powers in its grant of power to the Virgin Islands in the Revised Organic Act. Rev. Organ. Act of 1954 § 3 (1967).

> No State shall ... pass any ... Law impairing the Obligation
> of Contracts.

U.S. Const., Art. I § 10.[9] As can be seen, a tautological deadlock could easily ensue if a contract is impaired by a statute that has a claimed public purpose. Resolution of this deadlock is required because, as noted by the Supreme Court, "[i]f the Contract Clause is to retain any meaning at all ... it must be understood to impose *some*[10] limits upon the power of a State to abridge existing contractual relationships even in the exercise of its otherwise legitimate police power." Allied, supra at 242. The Allied Court looked to five of its prior opinions to help define these limits. A brief review of these cases is warranted to determine the parameters of this conflict.

In Home Building & Loan Asso. v. Blaisdell, 290 U.S. 398 (1934) the Court upheld Minnesota's police power against Contract Clause attack. There a mortgage moratorium statute was enacted to provide relief for homeowners threatened with foreclosure. This law conflicted with a lender's contractual foreclosure rights. The Court, however, acknowledged that despite the Contract Clause, States retain residual authority to safeguard the vital interests of their people. Allied, supra at 242; Blaisdell, supra at 434. Five factors were significant in upholding this law.

> First, the state legislature had declared in the Act itself that an emergency need for the protection of homeowners existed. Second, the state law was enacted to protect a basic societal interest, not a favored group. Third, the relief was appropriately tailored to the emergency that it was designed to meet. Fourth, the imposed conditions were reasonable. And, finally, the legislation was limited to the duration of the emergency.

Blaisdell, supra at 444-47.

It is implied in the Blaisdell opinion that if the moratorium legislation had not possessed the characteristics attributed to it by the Court, it would have been invalid under the Contract Clause.

---

[9] This prohibition is also included in the Revised Organic Act. Rev. Organ. Act of 1954 § 3 (1967).

[10] Emphasis in the original.

In three subsequent cases, the Supreme Court honed its jurisprudence concerning contract clause limitations of a state's police power. In W. B. Worthen Co. v. Thomas, 292 U.S. 426 (1934), the Court held invalid under the Contract Clause an Arkansas law that exempted the proceeds of a life insurance policy from collection by the beneficiaries. The Court stressed that the statute was not precisely and reasonably designed to meet a grave temporary emergency in the interest of the general welfare.

In W. B. Worthen Co. v. Kavanaugh, 295 U.S. 56, 60 (1935), the Court held invalid under the Contract Clause another Arkansas law stating "[e]ven when the public welfare is invoked as an excuse, . . . the security of a mortgage cannot be cut down 'without moderation or reason or in a spirit of oppression.'" Allied, supra at 243; Kavanaugh, supra at 60.[11]

Finally, in United States Trust Co. v. New Jersey, 431 U.S. 1 (1977), the Court held that legislative alteration of the rights and remedies of Port Authority bondholders violated the Contract Clause. Id. at 22. In its analysis the Court recognized a number of principles helpful to us. The Court again recognized that although the absolute language of the clause must leave room for the state's police power, that power has limits when its exercise effects substantial modifications of private contracts. Allied Steel, supra at 241, United States Trust, supra at 21. Additionally, the Court recognized that despite the customary deference courts give to state laws directed to social and economic problems, legislation adjusting contract rights must be reasonable and of a character appropriate to the public purpose justifying its adoption. Allied, supra at 233; United States Trust, supra at 22. With these parameters in mind, we turn to examine WICO's Contract Clause claim.

a) *Substantial Impairment*

■■ The threshold inquiry for Contract Clause issues is whether the statute has substantially impaired a contractual relationship. Allied, supra at 244; Keystone Bituminous Coal Assn. v. Duncan, 771 F.2d 707, 717 (3d Cir. 1985). In general a statute is considered a contract when "the language and circumstances evince a legislative intent to create private rights of a contractual

---

[11] Similarly, in Treigle v. Acme Homestead Assn., 297 U.S. 189, 196 (1936), the court, in holding a Louisiana law invalid under the Contract Clause stated, "[s]uch an interference with the right of a contract cannot be justified by saying that in the public interest the operations of building associations may be controlled and regulated . . . ."

nature enforceable against the state." United States Trust, supra 17 n.14 & 19-20 n.17. Here, the original settlement is clearly a contract and, following the above stated principle, the legislative ratification of the Memorandum is also considered a contract. That this contract has been impaired is a misnomer—it has been entirely eliminated.

By repealing both Act Nos. 3326 and 4700, the Legislature repudiated prior approval of the Memorandum and Addenda, and cancelled the authority of the governor to enter into the agreements. This has the further effect of repudiating the agreement and WICO's rights recognized therein by the Government of the Virgin Islands.

The Repeal Act also places WICO on the same footing as any other entity in seeking development and occupancy of submerged lands, giving WICO no greater rights than provided in the Coastal Zone Management Act. Thus, the seal of the Legislature is put on a repudiation of WICO's original grant from the Government of Denmark, and the recognition of that grant by the Government of the United States. It is difficult to contemplate how the legislative elimination of WICO's rights could be more comprehensive.

The first step, therefore, is satisfied.

b) *Significant and Legitimate Public Purpose*

That WICO's rights have been completely eliminated is significant in our next inquiry. We must determine whether there is a significant and legitimate public purpose behind the law such as remedying broad and general social or economic problems. Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 411 (1983); Keystone, supra at 717, Troy Ltd. v. Renna, 727 F.₂d 287, 297 (3d Cir. 1984). The government has a difficult burden ᵗo overcome at this second stage because "[t]he severity of the impairment measures the height of the hurdle the [territorial] legislation must clear." Allied Steel, supra at 245. Minor alterations of contract rights may end the inquiry after the first stage while severe impairments "push the inquiry to a careful examination of the nature and purpose of the [territorial] legislation." Id. at 245. Since the Legislature has completely eliminated WICO's rights, we must carefully scrutinize the nature and purpose of the legislation.

 Initially we note the existence of an important public interest alone is not always sufficient to overcome the Contract Clause limitation on legislative authority. United States Trust, supra at 21. Without doubt, protection of our islands' submerged lands is an important public interest which the Legislature, through use of its police power, could protect by invoking the public use doctrine. That this is a legitimate public use sufficient to overcome WICO's contract rights is an entirely different matter.

As stated in our prior analysis, WICO's development may in fact serve a greater public purpose than leaving the submerged lands inviolate. At least, this has been the assessment of every elected governor of the Virgin Islands, and two elected legislatures. As stated earlier, this development fits within those situations approved by the Supreme Court, so it cannot be said that prior legislatures had no authority to make the agreements they adopted.[12] Additionally, the Repeal Act did not address any broad and general social or economic problem. Rather, it can be argued, the Repeal Act exacerbates various existing problems.

Since the statute is solely directed at WICO, it cannot be characterized as addressing a broad and general societal interest.[13] As the Supreme Court cautions, a law directed against a specific entity "can hardly be characterized . . . as one to protect a broad societal interest . . . ." Allied, supra at 249.

The Repeal Act also fails to remedy an economic problem. Rather, it contributes to the present economic distress in the islands by stifling development which would create new employment.[14]

---

[12] The intervenors assert correctly that one legislature can neither abridge the powers of a succeeding legislature nor bargain away the police power of the state. United States Trust Co., supra at 23. The Memorandum as amended, however, does not limit the government's ability to gain title to the filled lands. It specifically recognizes the right to exercise eminent domain. The action in repealing WICO's rights could be considered a "taking" of private property without just compensation in violation of the Revised Organic Act. Rev. Organ. Act of 1954 § 3 (1967). This is an alternative claim made by WICO in this law suit, but since we find the repeal invalid, we do not reach this point.

[13] Indeed, as we will discuss later, if the repeal is valid, it will not have closed the door entirely on WICO, but conceivably will serve to reinstate all the rights WICO enjoyed under a treaty, thereby increasing the submerged lands subject to WICO's control, a result hardly intended by the Legislature.

[14] WICO intends to develop the land in question by building a hotel and marina. The Memorandum of Understanding in its preamble (pp. 7–8) recites the economic benefits the government expects to reap by settling WICO's claim.

380

Finally, unlike the situation in Blaisdell, where the Supreme Court upheld Minnesota's police power in the face of a Contract Clause attack, there is no emergency situation, similar to the Great Depression, here in the islands which the Repeal Act intends to address. Additionally, even assuming an emergency existed which the Repeal Act addressed, the act would still fail to pass constitutional scrutiny because the act is not limited to the duration of the emergency but purports to eliminate WICO's rights forever. Blaisdell, supra at 434.

3) *Adjustment of Rights*

██ Once a legitimate public purpose has been identified, the court must determine whether the adjustment of the parties' rights and responsibilities is based upon reasonable conditions and is of a character appropriate to the legislation's public purpose. United States Trust, supra at 22. Keystone, supra at 717. For this third inquiry courts should defer to the legislative judgment as to the reasonableness of the particular measure if the state itself is not a contracting party. United States Trust, supra at 22-23; Keystone, supra at 717. If the state is a contracting party, however, the court need not defer to the legislative judgment but is free to determine whether a less drastic modification would be sufficient. United States Trust, supra at 30-32; Keystone, supra at 717; Troy, supra at 296. In WICO's case, of course, the government is a contracting party.

The repudiation of WICO's rights in the submerged land is neither based upon reasonable conditions nor of a character appropriate to the Legislature's public purpose. By repealing the prior settlement, the Government in effect no longer recognizes WICO's right to title in the submerged lands. This adjustment is drastic and has no reasonable basis. WICO intends to develop the new land into a marina-hotel complex. We note that tourism is a major industry in the Virgin Islands and one of the express goals of Act Nos. 3326 and 4700, as well as other legislation, is to promote and assure priority for coastal-dependent economic development, such as hotels and marine facilities. See also 12 V.I.C. § 903(b)(3) (1982). Hotel and marine facilities are a common use for coastal zone areas. By extinguishing WICO's rights, the Legislature acted unreasonably. Its position finds no support in any hypothetical public policy, but it violates the stated public policy of an act intended to address the issues of coastal protection and development.

381

## B. *Irreparable Harm*

WICO has demonstrated it will be irreparably harmed should it be unable to continue dredging operations.

### 1) *Constitutional Violation*

██ ██ Interference with constitutional rights is considered irreparable injury. Planned Parenthood v. Citizens For Com. Action, 558 F.2d 861, 867 (8th Cir. 1977); Henry v. Greenville Airport Commission, 284 F.2d 631, 633 (4th Cir. 1960). The interference with WICO's contractual rights in violation of the Contract Clause, standing alone, is sufficient irreparable harm to support the result we reach.

### 2) *Economic Loss*

██ The possibility of significant economic losses, in addition to the constitutional interference, strengthens WICO's argument that it will be irreparably harmed. Normally, a defendant's ability to compensate a plaintiff with money damages precludes the issuance of a preliminary injunction. Nuclear-Chicago Corp. v. Nuclear Data Inc., 465 F.2d 428, 430 (7th Cir. 1972). A court may, however, look to the financial strength of a defendant to determine whether or not a defendant could compensate the petitioner with money damages. Eli Lilly & Co. v. Premo Pharmaceutical Labs, 630 F.2d 120, 137 (3d Cir.), cert. denied, 449 U.S. 1014 (1980).

██ We have no difficulty taking judicial notice that the Virgin Islands government is in difficult financial straits. We have had numerous cases in front of us in which persons with legitimate claims against the government in the multiple millions of dollars have been unable to obtain funds owing them. In each instance, government attorneys have cited the lack of funds with which to pay, and the debts remain unpaid to this day. Included among the claims are those which would have the highest priority, i.e., payments to employees of the government owing for several years. In addition, even if the funds were available, the government could refuse to make payment. Being exempt from levy and execution, it could not be forced to alter such a posture.

382

Additionally, WICO has already paid more than half a million dollars on a dredging contract. More than 60,000 tons of fill are in place and at risk of being washed away should a serious storm arise. There is no question WICO would suffer irreparable harm even without the constitutional violation.[15]

## C. *Other Relevant Elements*

We have covered thus far the two central elements necessary for a preliminary injunction under the holding of Professional Plan, supra. They are the reasonable probability of eventual success in the litigation, and that the movant will be irreparably harmed if relief is not granted. As our discussion began, we noted that Professional Plan contemplated two additional elements when relevant. These are the possibility of harm to other interested persons from the grant or denial of the injunction, and the public interest.

We take these two elements together because they are intertwined. The citizen intervenors have cited no direct possibility of harm to themselves or others in the community, apart from the public interest which they seek to protect. Our disagreement is whether the public interest is served or harmed by permitting the continued reclamation of land by WICO for the purposes contained in the agreements.

The public interest sought to be implemented in the Memorandum in favor of the people of the Virgin Islands is substantial. We described the benefits to be gained by the government and its citizens outlined in the Memorandum and will not repeat them here. To permit WICO to assert its rights pursuant to the Memorandum and Addenda serves the public interest. To adopt the intervenors' arguments in favor of halting the dredging and upholding the repeal of WICO's rights, would invite chaos.

We refer to a point touched on several times earlier in this opinion. If the repeal is permitted, as we view the law it would not, as an end result, eliminate WICO's rights in Charlotte Amalie harbor. Rather, it would then expand back to the original rights

---

[15] At this time the reclaiming work is not complete. A dredge fill dike has been erected on the seaward side. Behind this is a settling pond where the 60,000 tons of dredge spoil have been deposited. Placement of rock armor has commenced but is incomplete. The rock armor is designed to protect the reclaimed land from erosion from the ocean. Should a storm hit St. Thomas prior to completion of the rock armor, there is a risk of the reclaimed land being washed away.

contained in the concession from the Government of Denmark in 1913. These rights have been forcefully recognized by the signatories to the 1917 Treaty, i.e., Denmark and the United States. They include nearly triple the reclamation potential contained in the Memorandum and Addenda, and the use of the reclaimed land would not be subject to the restrictions contained in the Memorandum.

The public interest would not be served by the possibility of a return to such a situation. For this reason, we find that the granting of a preliminary injunction, permitting WICO to exercise the limited rights agreed to in the Memorandum, would better serve the government and people of the Virgin Islands than the spectre of reinstatement of the vastly enlarged rights contained in the 1913 concession.

## III. CONCLUSION

We find that WICO has satisfied all of the conditions necessary for a preliminary injunction. In reaching that conclusion, we have covered the legal bases a court must consider when confronting the issues presented herein. But we cannot close without addressing the matter from a larger perspective than the nuts and bolts of stare decisis. We speak of questions of honor and the integrity of one's promises. They apply with no less force to government than to others. In this instance, the only three elected governors the territory has ever had and their respective attorneys general, acting with the men and women elected to two separate legislatures, bound themselves and the government to promises solemnly given. If what they did in good faith and in pursuit of their vision of the public interest is to be lightly discarded many years later, we ask: who would, without trembling and consternation, deal with such a government in the future? And who, ultimately would be the loser? The question answers itself. The people of the Virgin Islands would suffer the loss if their government's promises are considered as will-o-the-wisp, to be kept when convenient, and broken as desired.

We acknowledge that the citizen intervenors' views are honestly come by and sincerely held. Their promotion of the public interest as they view it cannot be deprecated. We only regret that on the issues in this case, our own view of that public interest diverges from theirs.

All persons interested in this controversy would do well to read United States v. 119.67 Acres of Land, 663 F.2d 1328 (5th Cir. 1981). This case was cited at oral argument and pursuasively supports our decision. Under a subsection entitled "Binding the Government to its Word", there appear the following words:

> The Government does not deny the words, or even the agreement, which it, together with its adversaries, importuned the District Court to approve. On the contrary, acknowledging in the best Boy Scout tradition the words spoken, the agreements made, and the consensual judgment entered, the Government, now claiming to be adorned with the protective armor against which neither equities nor accepted morality may penetrate, takes the simple, but awesome position that what it agreed to was of no moment because it was *mistaken*[16] on the operative facts.

119.67 Acres, at 1333.

Our attitude is similar to that of the Fifth Circuit in discussing promises made by the United States. The Legislature of the Virgin Islands should not be permitted to ignore its word of honor pledged in the agreements with WICO, carrying the entire Government of the Virgin Islands along with it.

 A preliminary injunction will issue enjoining interference with WICO's rights under the Memorandum of Understanding and Addenda thereto.

## PRELIMINARY INJUNCTION

THIS MATTER is before the Court on motion of The West Indian Company, Limited, seeking a preliminary injunction.

The Court having filed its memorandum opinion of even date herewith, and the premises considered, now therefore it is

ORDERED:

THAT, the Government of the Virgin Islands, the Virgin Islands Legislature, and the citizen intervenors captioned above be, and the same, are hereby ENJOINED from all interference with the rights of The West Indian Company, Limited under the 1973 Memorandum Agreement, and Addenda thereto, pending a final hearing on the merits.

---

[16] Emphasis in the original.